**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| In re: Administrative Subpoena<br>No. 25-1431-033 | Case No.   1:26-mc-18_____<br><br>Judge        _____ |

## MOTION TO MODIFY SUBPOENA

Respondent Children's Hospital Medical Center ("Cincinnati Children's" or "Respondent"), pursuant to 18 U.S.C. § 3486(a)(5), hereby moves to modify Subpoena No. 25-1431-033 (the "Subpoena") issued by the Civil Division of the United States of America Department of Justice (the "DOJ" or "Requestor") on July 8, 2025. Requestor is an agency pursuant to 5 U.S.C § 701(b)(1). The Subpoena was issued pursuant to 18 U.S.C § 3486, which authorizes the Attorney General to investigate "Federal health care offenses" as defined in 18 U.S.C. § 24(a).

The Subpoena contains fifteen requests (the "Requests," and each one a "Request"), including several that expressly or impliedly call for the production of the identities and protected health information ("PHI")[1] of minor patients who have received certain medical care from Respondent, a pediatric academic medical center located in Cincinnati, Ohio, during the period relevant to the Subpoena (defined in the Subpoena as January 1, 2020, to July 8, 2025, or the "Relevant Period").

---

[1] Under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), protected health information includes all "individually identifiable health information." This includes any information, including demographic information, relating to the individual's past, present, or future physical or mental health or condition, the provision of health care to the individual, or the past, present, or future payment for the provision of healthcare, that could be used to identify the individual, or for which there is a reasonable basis to believe that it could be so used.  45 C.F.R. § 160.103.

Respondent hereby moves this Court for an order modifying the Subpoena to exclude the Requests identified below that facially seek PHI and patient records (the "Patient Records Requests") and limiting any and all other Requests to the extent such Requests call for the production of PHI:

- Request 11: "[d]ocuments sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

- Request 12: "[f]or each such patient identified in Subpoena [Request 11], documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

- Request 13: "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in Subpoena [Request 11], including any disclosures about off-label use (*i.e.,* uses not approved by the United States Food and Drug Administration) and potential risks."

The grounds for granting this relief are set forth more fully in the accompanying Memorandum in Support.

Dated: May 14, 2026                     Respectfully submitted,

                                        /s/ Lindsay K. Gerdes
                                        Lindsay K. Gerdes (0100896)
                                        J. David Brittingham (0061577)
                                        Joseph K. Merical (0098263)
                                        **DINSMORE & SHOHL LLP**
                                        255 E. 5th Street, Ste. 1900
                                        Cincinnati, OH 45202
                                        Telephone: (513) 977-8200
                                        Facsimile: (513) 977-8147
                                        Lindsay.Gerdes@dinsmore.com
                                        David.Brittingham@dinsmore.com
                                        Joseph.Merical@dinsmore.com

                                        Neal K. Katyal (*pro hac vice* forthcoming)
                                        Colleen E. Roh Sinzdak (*pro hac vice* forthcoming)
                                        Chase J. Hanson (*pro hac vice* forthcoming)
                                        **MILBANK LLP**
                                        1101 New York Avenue NW
                                        Washington D.C. 20005
                                        Telephone: (202) 835-7500
                                        Facsimile: (202) 263-7586
                                        nkatyal@milbank.com
                                        crohsinzdak@milbank.com
                                        chanson@milbank.com

                                        Nola B. Heller (*pro hac vice* forthcoming)
                                        Scott B. Singer (*pro hac vice* forthcoming)
                                        Haley Ling (*pro hac vice* forthcoming)
                                        Madeline Van Ert (*pro hac vice* forthcoming)
                                        **MILBANK LLP**
                                        55 Hudson Yards
                                        New York, NY 10001
                                        Telephone: (212) 530-5000
                                        Facsimile: (212) 530-5219
                                        nheller@milbank.com
                                        ssinger@milbank.com
                                        hling@milbank.com
                                        mvanert@milbank.com

- 3 -

## MEMORANDUM IN SUPPORT

This case concerns the Department of Justice's improper attempt to subpoena one of the most private categories of information in existence—the medical records of children. Lacking a specific basis to believe that any federal law has been violated, the government indiscriminately seeks the medical records of *all* children who received certain medications and therapies at Cincinnati Children's between January 2020 and July 2025. This breathtakingly broad request not only violates the law, it also burdens privacy, speech, and associational rights protected by the Constitution itself. This Court should follow the lead of all other courts to have considered similar motions and strike the portions of the Subpoena that call for PHI.

In July 2025, Cincinnati Children's received an administrative subpoena from the DOJ, issued pursuant to Section 248 of the Health Insurance Portability and Accountability Act of 1996. The Subpoena seeks information regarding the provision of "gender-related care" to Cincinnati Children's patients under the age of eighteen.[2] Among other items, the Subpoena seeks the production of PHI for each patient who was prescribed certain pharmaceutical products at Cincinnati Children's during the Relevant Period, including the most sensitive category of records that the hospital maintains: individual minors' patient records reflecting confidential patient-physician communications, clinical diagnoses, and provider notes.

Upon receiving the Subpoena, Cincinnati Children's raised and preserved objections to the production of PHI, which it memorialized in writing and continuously reiterated to the DOJ while cooperating in good faith with the rest of the Subpoena. In late April 2026, after having agreed for a period of nearly nine months to pause discussions of materials containing PHI, the DOJ

---

[2] "Gender-related care" is defined in the Subpoena as "any medical, surgical, psychological, or social treatment provided to individuals to alter their physical appearance or social presentation to resemble characteristics typically associated with the opposite biological sex."  Ex. 1, Attachment A at 3.

- 1 -

demanded that Cincinnati Children's confirm whether it intended to fully comply with the Subpoena, including by producing patient records. Cincinnati Children's then undertook good-faith efforts to determine whether it could fully comply with the Subpoena while still protecting its minor patients' PHI. Cincinnati Children's has now concluded that it is not possible to do so.

Cincinnati Children's does not dispute that the government may in certain instances subpoena patient records in healthcare investigations. But the DOJ has not articulated why PHI is reasonably relevant or necessary to its investigation of potential violations of the Federal Food, Drug, and Cosmetic Act of 1938 ("FDCA"), especially when balanced against the extraordinary privacy concerns at issue and the burdens of production. Accordingly, Cincinnati Children's is compelled to move under 18 U.S.C. § 3486(a)(5) for an order excluding the Patient Records Requests, and limiting any other Request to the extent it calls for the production of PHI.

## VENUE

Venue is proper in the Southern District of Ohio, Western Division, under 18 U.S.C. § 3486(a)(5) because Cincinnati Children's does business and resides within the District. *See* Declaration of Dr. Armand H. Matheny Antommaria ("Antommaria Decl.") ¶ 6.

## FACTUAL BACKGROUND

**I.      During the Relevant Period, Cincinnati Children's Provided Gender-Affirming Care to the Extent Permitted by Ohio Law**

Cincinnati Children's is a leading pediatric academic medical center located in Cincinnati, Ohio that has served patients in the greater Cincinnati area since 1883. *Id*. It is consistently ranked as one of the best children's hospitals in the country. *Id.* ¶ 7. During the Relevant Period, Cincinnati Children's provided developmentally appropriate, evidence-based health services to patients who are transgender, gender-nonconforming, and/or seeking treatment for gender dysphoria as

permitted by Ohio law, including by providing mental health services, social work services, and medical interventions involving the prescription of puberty-blocking drugs or hormones. *Id.* ¶ 8.

In 2024, Ohio House Bill 68 ("HB 68") took effect. *Id.* ¶ 9. HB 68 prohibits the prescription of "cross-sex hormones" or "puberty-blocking drugs" to minors for the purpose of assisting with gender transition, but allows providers to continue prescribing such medications to patients who meet certain criteria (*i.e.*, who are continuous residents of Ohio, began such treatment prior to April 25, 2024, and would be harmed by stopping treatment). *Id.* Cincinnati Children's continues to care for transgender and gender-nonconforming patients within the bounds of Ohio law. *Id.* ¶ 10.

## II. The Subpoena Seeks Production of Patient Health Records

### A. The Subpoena

On July 8, 2025, the DOJ served Cincinnati Children's with the Subpoena, issued pursuant to 18 U.S.C. § 3486, which authorizes the Attorney General to investigate "Federal health care offenses as defined in 18 U.S.C. § 24(a)." Ex. 1, at 1. The Subpoena contains fifteen Requests that collectively seek production of personnel files for nearly any person affiliated with Cincinnati Children's; billing records, manuals, or protocols regarding the use of diagnosis codes in connection with "gender-related care" to minors; communications with pharmaceutical manufacturers regarding certain drugs; and documents relating to "adverse event[s]" related to "gender-related care." Ex. 1, Attachment A at 5–7. Most notably, the Subpoena includes the Patient Records Requests (Request Nos. 11, 12, and 13), which, on their face, call for the production of patient identifying information and highly sensitive patient records. *Id.* Other Requests may also be read to seek production of patient records and PHI—including, for example, Request Nos. 14 and 15, which the DOJ recently confirmed call for the production of patient records. *See*

- 3 -

Government's Response in Opposition at 15, *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-00007-MSM-AEM (D.R.I. May 7, 2026), Dkt. No. 9.

On August 22, 2025, Cincinnati Children's served the DOJ with Responses and Objections, in which it objected to any Requests that sought PHI. Ex. 2, at 2, 16–20 (objecting to requests because they sought "the production of sensitive, personally identifying information, including private health records protected by HIPAA and/or Ohio law"). The DOJ agreed to pause discussions of the production of PHI while Cincinnati Children's responded to Requests that did not call for such material. Between August 2025 and April 2026, Cincinnati Children's engaged in a cooperative dialogue with the government regarding its responses to the Subpoena and made multiple productions of documents that did not include PHI. The parties had no contact between December 22, 2025 and April 24, 2026 while Cincinnati Children's awaited the DOJ's approval of search terms to be used for its electronic communications review. On April 24, 2026, after four months of silence, the DOJ demanded to know Cincinnati Children's position on whether it would comply in full with the Subpoena, including through the production of its patients' PHI. After careful consideration, Cincinnati Children's has concluded that such full compliance is impossible.

Patient records contain voluminous compilations of information about a person's body, mental health, sexuality, vaccinations, history of illnesses, living situation, family, relationships, and more. Antommaria Decl. ¶ 16. These records may include provider notes and observations from a child's visits to the hospital or outpatient clinics, details on a child's diagnosis and treatment for various conditions, and details of confidential and highly sensitive communications between the child, the child's parents or guardians, and Cincinnati Children's providers. *Id.* Just one patient's file can be hundreds or even thousands of pages long. *Id.* ¶ 23. The records are comprehensive and saturated with information about a patient's personal life, medical history, and

- 4 -

family circumstances that could be used to identify the patient even if their name or date of birth were to be redacted. *Id.* ¶¶ 23–24. As a rule, such records contain highly sensitive, deeply personal information about a child's physical and mental health—information that children and their families trust will be protected from disclosure. *Id.* ¶¶ 16, 20. Maintaining this sort of trust between patients and their health care providers is integral to ensuring transparent, honest communication in health care settings, which, in turn, is essential to securing better health outcomes. *Id.* ¶¶ 19–21. Even heavily redacted versions or summary forms of those records would contain sensitive personal details relating to a patient's clinical diagnoses, prescription dosage, and encounters with hospital providers—and the DOJ has made clear that even if it agrees to accept anonymized data in the first instance, it will reserve the right to later "unmask" any patient. Declaration of David Gunn ¶ 2, *In re: Administrative Subpoena 25-1431-032 to Rhode Island Hospital*, 1:26-mc-00007-MSM-AEM (D.R.I. May 13, 2026), Dkt. 32-1 ("Gunn Decl.") (suggesting that anonymization of patient records must be conditioned on agreement to "unmask particular patients" in the future).

### B. The Context for the Subpoena

On January 28, 2025, President Trump issued Executive Order 14187, entitled "Protecting Children From Chemical and Surgical Mutilation" ("E.O. 14187").[3] The Order directed the Attorney General to conduct investigations with the objective to "end" gender-affirming care. E.O. 14187 § 8. On April 22, 2025, then-Attorney General Pam Bondi issued a memo entitled "Preventing the Mutilation of American Children" (the "Bondi Memo").[4] Among other things, the Bondi Memo directed the DOJ to "undertake appropriate investigations of any violations of the Food, Drug, and Cosmetic Act by manufacturers and distributors engaged in misbranding . . . of

---

[3] Exec. Order No. 14187, 90 Fed. Reg. 8771 (Feb. 3, 2025).

[4] Memorandum from Att'y Gen. on Preventing the Mutilation of American Children to Select Component Heads (Apr. 22, 2025), https://www.justice.gov/ag/media/1402396/dl.

puberty blockers, sex hormones, or any other drug used to facilitate a child's so-called 'gender transition.'" The objective of these directives is clear on the face of the Memo: to "bring [gender-affirming care] to an end." *Id*. at 6.

On June 11, 2025, Assistant Attorney General Brett Shumate stated that the DOJ would use "all available resources to prioritize investigations of doctors, hospitals, pharmaceutical companies, and other appropriate entities" providing gender-affirming care, including "possible violations of the [FDCA] and other laws by (1) pharmaceutical companies that manufacture drugs used in connection with so-called gender transition and (2) dealers such as online pharmacies suspected of illegally selling such drugs."[5] The same day—and in the days and weeks following— the DOJ issued subpoenas to multiple hospitals across the country. Within a month, it had issued "more than 20 subpoenas to doctors and clinics involved in performing transgender medical procedures on children,"[6]—one of these was the Subpoena issued to Cincinnati Children's.

### C.      Courts Have Uniformly Quashed Substantively Identical Subpoenas

Numerous providers and patient consortia across the country have moved to quash or limit substantively identical subpoenas to that received by Cincinnati Children's, either in whole or in part. *All seven federal district courts* to have reached the merits of those motions have granted them.[7] *See In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-00007 (D.R.I. May 13, 2026) (Rhode Island Hospital); *2025 Subpoena to Child.'s Nat'l Hosp.*, 2026 WL 160792, at *9 (D. Md. Jan. 21, 2026) (patients of Children's National); *In re 2025 UPMC Subpoena*, 2025 WL

---

[5] Memorandum from Brett A. Shumate on Civil Division Enforcement Priorities to All Civil Division Employees at 2–3, https://www.justice.gov/civil/media/1404046/dl?inline.

[6] Press Release, Office of Public Affairs, U.S. Dep't of Just., Department of Justice Subpoenas Doctors and Clinics Involved in Performing Transgender Medical Procedures on Children (July 9, 2025), https://www.justice.gov/opa/pr /department-justice-subpoenas-doctors-and-clinics-involved-performing-transgender-medical.

[7] One district court in the Northen District of Texas signed a request for enforcement against Rhode Island Hospital by the DOJ without notice or substantive briefing on April 30, 2026.  Order, *In re Admin. Subpoena 25-1431-032*, No. 4:26-mc-00006-O (N. D. Tex. Apr. 30, 2026), Dkt. No. 2.  That subpoena has now been quashed. *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-00007 (D.R.I. May 13, 2026).

3724705, at *3 (W.D. Pa. Dec. 24, 2025) (patients of University of Pittsburgh Medical Center); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 607 (E.D. Pa. 2025) (Children's Hospital of Philadelphia); *QueerDoc, PLLC v. U.S. Dep't of Just.*, 807 F. Supp. 3d 1295, 1302 (W.D. Wash. 2025) (QueerDoc); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 239 (D. Mass. 2025) (Boston Children's), *appeal docketed* No. 26-1093  (1st Cir. Jan. 30, 2026); *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *17 (W.D. Wash. Sept. 3, 2025) (Seattle Children's). Similar motions are pending in at least three districts.[8]

Cincinnati Children's does not make this motion lightly. It believes very much in the tradition of government enforcement. It has deeply considered the government's Requests while at the same time weighing the extremely private nature of the patient records sought, the challenge of de-identifying patient records in a manner consistent with the government's demands, and the likely negative impact on patients that compliance with the Patient Records Requests would cause. After due consideration, it is evident that even if the DOJ permitted Cincinnati Children's to produce the requested patient PHI with extensive redactions, the burden of performing such de-identification would be prohibitive and likely require near-complete redaction of patient files. Even if Cincinnati Children's could feasibly perform such redactions, the DOJ has reserved the right to seek—and indicated its intent to demand—unredacted records at some future time. *See* Gunn Decl. ¶ 2. As such, Cincinnati Children's respectfully moves to exclude the Patient Records Requests and limit any other Request to the extent it calls for production of PHI.[9]

---

[8] *See* Motion to Quash Subpoena, *In re DOJ Admin. Subpoena No. 25-1431-030*, 1:25-mc-00063-SKC-CYC, (D. Colo. Aug. 8, 2025), Dkt. 1  (Children's Hospital Colorado); Motion to Limit Subpoena, *In re Child.'s Nat'l Subpoena No. 25-1431-028*, No. 8:26-cv-01825 (D. Md. May 8, 2026), Dkt. No. 1 (Children's National); Motion to Quash Subpoena, *In re Admin. Subpoena 25-1431-017 to Child.'s Health Care*, No. 0:26-mc-00026 (D. Minn. May 4, 2026), Dkt. No. 1 (Children's Minnesota).

[9] While Cincinnati Children's intends to continue to cooperate with the DOJ with respect to the other Requests, Cincinnati Children's reserves the right to later challenge any aspect of the Subpoena to the extent that it inappropriately infringes on patient privacy rights or exceeds the DOJ's authority under applicable law.

## ARGUMENT

A court will enforce an administrative subpoena "if 1) it satisfies the terms of its authorizing statute, 2) the documents requested were relevant to the [government's] investigation, 3) the information sought is not already in the [government's] possession, and 4) enforcing the subpoena will not constitute an abuse of the court's process." *Doe v. United States*, 253 F.3d 256, 265 (6th Cir. 2001). The Subpoena fails to meet the requisite criteria.

First, the FDCA does not authorize the DOJ to subpoena individual patient records because the FDCA does not regulate the practice of medicine. Second, the documents sought by the Patient Records Requests are not relevant to the DOJ's investigation of supposed "misbranding" or "mislabeling" violations. Finally, enforcement of the Subpoena would constitute an abuse of the court's process because the Patient Records Requests were issued for an improper purpose.

## I.      Good Cause Exists to Modify the Subpoena Now

A recipient of a subpoena issued under 18 U.S.C. § 3486 may petition to set aside that subpoena "[a]t any time before the return date specified in the summons." 18 U.S.C. § 3486(a)(5). But courts in this Circuit permit subpoena objections or motions made after the applicable deadlines "[i]n unusual circumstances and for good cause" shown. *Am. Elec. Power Co. v. United States*, 191 F.R.D. 132, 136–37 (S.D. Ohio 1999) (citation omitted); *see also Maysey v. Henkel Corp.*, 2018 WL 314859, at *2 (W.D. Ky. Jan. 5, 2018).

Such circumstances include when the parties "were in contact concerning . . . compliance prior to the time [of] challeng[ing] the legal basis for the subpoena," or when the subpoena's requests "exceed[] the bounds of fair discovery." *Am. Elec. Power Co.*, 191 F.R.D. at 136–37. It would be "manifestly inequitable" to deny a motion to modify filed after the return date when the parties had been engaged in a dialogue "of cooperation, rather than contention," and "had an agreement" regarding production of certain documents. *In re Goodyear Tire & Rubber Co. Sec.*

*Litig.*, 1991 WL 172930, at *1 (N.D. Ohio June 21, 1991); *see also Am. Elec. Power Co.*, 191 F.R.D. at 137 (finding a "strict application" of Rule 45's timing requirement "unjustified" in part due to the party's "overall cooperation with the Government's discovery efforts, its extensive production of documents . . . and the ongoing communication between counsel . . . [and] the Government concerning [its] objections"). A contrary approach under these circumstances "would discourage informal dispute resolution among parties" and "work against the efficient administration of justice" by requiring parties to prematurely bring issues to the court despite a cooperative dialogue. *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 1991 WL 172930, at *1.

Although the return date for the Subpoena has passed, there is clearly good cause for this Court to consider this motion in accordance with these precedents. Since the Subpoena was issued, Cincinnati Children's has been engaged in a cooperative dialogue with the government and has produced documents and information in response to multiple Requests, emphasizing that it intends to comply with the Subpoena to the extent it can do so while protecting patient privacy. *See supra* Section II.A. Between August 2025 and April 2026, the government made clear that it accepted that position, and agreed that any consideration of the production of PHI was on hold pending the production of other materials. Now, given the government's recent demand for full compliance, Cincinnati Children's must file this motion to protect its patients' privacy interests. Under these circumstances, good cause exists to justify the filing of this motion.

## II.     The FDCA Does Not Authorize Subpoenaing Individual Patient Records

HIPAA authorizes the Attorney General to issue a subpoena seeking information relevant to an investigation of "a Federal health care offense." In recent court filings related to similar subpoenas, the DOJ has indicated that the "federal health care offense[s]" under investigation here are potential violations of the FDCA "relating to the on- or off-label use by manufacturers and distributors of drugs including puberty blockers, sex hormones, or any other drug used to facilitate

a child's so-called 'gender transition.'" Declaration of Lisa K. Hsiao ¶ 3, *In re Admin. Subpoena 25-1431-032*, No. 4:26-mc-00006-O (N.D. Tex. Apr. 30, 2026), Dkt. No. 1-1 ("Hsiao Decl.").[10] Specifically, the DOJ purports to be investigating a "a violation of, or a criminal conspiracy to violate" Section 301 of the FDCA, which makes it unlawful to, *inter alia*, "introduc[e] or deliver[] for introduction into interstate commerce . . . any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded," "adulterat[e] or misbrand[] [] any food, drug, device, tobacco product, or cosmetic in interstate commerce," and "introduc[e] or deliver[] for introduction into interstate commerce . . . any" unapproved new drug. 21 U.S.C. § 331(a), (b), (d); Hsiao Decl. ¶ 9. The DOJ has said it is investigating off-label marketing of puberty blockers and hormones by pharmaceutical manufacturers, and whether hospitals have committed fraud in providing gender-affirming care to minor patients. Government's Response in Opposition at 17, *In re Administrative Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-00007-MSM-AEM (D.R.I. May 7, 2026).

The FDCA does not authorize the government to subpoena patients' medical records in this way. As the Supreme Court has explained, under the FDCA, "the FDA is charged with the difficult task of regulating the marketing and distribution of medical devices *without intruding upon decisions statutorily committed to the discretion of health care professionals*." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350 (2001) (emphasis added)). Here, the government seeks records concerning medical providers' discretionary observations and medical judgments about diagnoses and treatments, not the labeling or branding of drugs already introduced into commerce.

Citing *Buckman*, the Sixth Circuit has made clear that "[a]lthough the [FDCA] regulates a manufacturer's distribution of drugs, it does not go further by regulating a doctor's practice of

---

[10] The DOJ's primary theory appears to be that hormones and puberty blockers, while approved by the U.S. Food and Drug Administration (the "FDA") for certain indications such as precocious puberty or prostate cancer, have not been approved as "safe or effective" for unapproved uses such as the treatment of gender dysphoria. *See* Hsiao Decl. ¶ 22.

medicine" and it "does not prohibit doctors from prescribing an FDA-approved drug . . . for an 'off-label' use." *Ass'n of Am. Physicians & Surgeons v. United States Food & Drug Admin.*, 13 F.4th 531, 534 (6th Cir. 2021). The FDCA "leaves the regulation of doctors to the states," *id.*, as has been their traditional police power since the founding, *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996). Courts across the country agree with this position. *E.g.*, *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 505 (6th Cir. 2006) ("Off-label use does not violate federal law or FDA regulations because the FDA regulates the marketing and distribution of drugs in the United States, not the practice of medicine, which is the exclusive realm of individual states."); *United States v. Facteau*, 89 F.4th 1, 15 (1st Cir. 2023) ("[M]edical professionals may lawfully prescribe and administer a device for an off-label use as long as that device has received [FDA] clearance for any intended use."); *In re Schering Plough Corp. Intron/Temodar Consumer Class Action*, 678 F.3d 235, 240 (3d Cir. 2012) ("Because the FDCA does not regulate the practice of medicine, physicians may lawfully prescribe drugs for off-label uses.").

The uniformity of precedent on this issue is hardly surprising, especially because many prescription medications given to children are prescribed off-label; medical testing is not generally done on children, preventing formal approvals. *See* Kathleen A. Neville et al., *Off-Label Use of Drugs in Children*, 133 Pediatrics 563, 563 (2014) (noting that off-label use of FDA-approved drugs is often necessitated for children "because an overwhelming number of drugs still have no information in the labeling for use in pediatrics," and that "the term 'off-label' does not imply an improper, illegal, contraindicated, or investigational use"). To hold otherwise would essentially prevent physicians from prescribing medications for children without risking prosecution—an absurd result that would endanger the lives of American children.

- 11 -

In fact, until now, the FDA and the DOJ's Office of Legal Counsel have consistently interpreted the FDCA as *not* extending to the regulation of the practice of medicine by individual doctors. As recently as 2019, the Office of Legal Counsel opined that, "[a]s a general matter, FDA does not regulate the practice of medicine, which includes 'off-label' prescribing—that is, when physicians prescribe FDA-approved drugs or devices for non-FDA-approved use," so "while the FDCA bars a manufacturer or distributor from selling any drug or device for an unapproved use, physicians may, with limited exceptions, prescribe and administer FDA-approved drugs and devices for unapproved uses." *Whether the Food & Drug Administration Has Jurisdiction Over Articles Intended for Use in Lawful Executions*, 43 Op. O.L.C. 81, 85 (2019). The government's own interpretation of the FDCA weighs in favor of concluding (as all courts have) that the FDCA does not and cannot regulate doctors' prescribing decisions. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of what the law is." (citation modified)).

Because doctors' prescription decisions are not regulated by, and cannot create liability under, the FDCA, the Attorney General lacks statutory authorization under 18 U.S.C. § 3486(a)(1)(A)(i) to subpoena individual patient records. Yet that is exactly what the Patient Records Requests seek to compel. By the time a doctor prescribes medication to treat a condition the provider has observed and discussed with the patient (the exact information patient records contain), the conduct the FDCA regulates has already occurred; drug and medical device manufacturers have already "introduc[ed] or deliver[ed] for introduction into interstate commerce" the drug or device prescribed. 21 U.S.C. § 331(a); *see Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 534. The FDCA extends no further than that and does not intrude on states' traditional prerogative to regulate the practice of medicine. *See Buckman*, 531 U.S. at 350–51.

Accordingly, the Patient Records Requests do not fall within Section 3486's authorization and must be excluded. *See Doe*, 253 F.3d at 262 (requiring compliance with authorizing statute for enforcement).[11] This Court should join the others that have concluded that the Patient Records Requests are not authorized by Section 3486. *E.g.*, *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d 555, 580 (E.D. Pa. 2025) ("The Department of Justice has not offered a factual basis (rather than investigative speculation) to find the personally identifying and clinical child-patient records sought in Requests 11, 12, and 13 are relevant to an authorized investigation of a *federal health care offense* within the meaning of Section 3486."); *In re 2025 Subpoena to Child.'s Nat'l Hosp.*, 2026 WL 160792, at *8 ("The Government seeks to investigate how the Hospital treats its patients; specifically, in the context of gender-affirming patient care. But the FDCA regulates commerce, not patient care."); *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at *8.

## III. The Burden of Producing Patient Records Far Outweighs Their Relevance

### A. Patient Records Are Not Relevant to a Federal Health Care Offense

An administrative subpoena may be enforced only when "the information sought is reasonably relevant" to the investigation in question. *Doe*, 253 F.3d at 263 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652–53 (1950)). The Patient Records Requests fail that test. While the government has broad authority to subpoena documents, that authority is not limitless. "[T]he subpoena cannot be so broadly stated as to constitute a 'fishing expedition.'" *EEOC v. K-Mart Corp.*, 694 F.2d 1055, 1066 (6th Cir. 1982) (quoting *EEOC v. Univ. of N.M.*, 504 F.2d 1296, 1301–02 (10th Cir. 1974)). Crucially, relevance is "inherently" connected to the government's authority to subpoena, meaning relevance is measured by "whether the documents requested

---

[11] While *Doe* enforced a subpoena that required disclosure of patient records, the subpoena recipient there did not "dispute[] the reasonableness of the government's request for patient documents," so the court did "not address th[at] aspect of the subpoena." 253 F.3d at 265. Instead, the case concerned the recipient's "professional education and the extent of his ethical training," his "personal and business financial records," and "bank and other financial records of [his] children" showing assets "provided or derived from individual or jointly held assets of" the recipient. *Id.*

pursuant to the subpoena are relevant to the health care fraud investigation being undertaken." *Doe*, 253 F.3d at 266. Here, the Patient Records Requests seek information irrelevant to the government's investigation of a "[f]ederal health care offense."

The FDCA regulates "a manufacturer's distribution of drugs" by imposing labeling and branding requirements on manufacturers and distributors. *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 534; 21 U.S.C. § 352 (setting forth labeling requirements). The statute "does not go further by regulating a doctor's practice of medicine." *Id.*; *see also In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 579 ("Congress, through the Act, regulates the introduction, labeling, and distribution of drugs in interstate commerce; it does not govern how physicians diagnose patients, obtain consent, document treatment, or communicate with them."). Patient records reflect medical providers' observations and treatment decisions; they do not bear on whether drugs or medical devices carry necessary labeling and branding. *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 580 ("Those children's records concern lawful medical practice governed by [state] law, not potential Section 331 violations involving a health care benefit program."); *In re Dep't of Just. Admin. Subpoena No. 25-1431-030*, 2026 WL 33398, at *11 (D. Colo. Jan. 5, 2026) (Chung, Mag. J.) (finding identical patient records requests not relevant to FDCA investigation because "misbranding in the stream of commerce is the FDCA's focus" and the requests "seek personal health data.").

Further, the notion that patient records could prove fraudulent intent under the FDCA is plainly wrong. The FDCA imposes liability only where an intent to mislead or defraud accompanies an underlying mislabeling or misbranding violation of Section 331. *E.g.*, *United States v. Mitcheltree*, 940 F.2d 1329, 1349 (10th Cir. 1991) ("[T]he specific intent requirement in § 333(a)(2) requires not only proof of misbranding under § 331, but also proof of an intent to

- 14 -

mislead or defraud which is connected to the misbranding violation under § 331."). Because the FDCA regulates "manufacturer[s]," any intent that could be divined from *patient records* is categorically unrelated to the intent relevant to the statute. *See* 21 U.S.C. §§ 333(a)-(b). Because Section 331 of the FDCA does not regulate the prescribing decisions of doctors, the intent of Cincinnati Children's providers is entirely downstream of any potential FDCA violation.

Nor are patient records relevant to the scale of potential FDCA violations. Because patient records do not bear on any potential liability under the FDCA—a statute that governs labeling and misbranding, not "a doctor's practice of medicine," *Ass'n of Am. Physicians & Surgeons*, 13 F.4th at 534—they cannot reveal the scale of a violation any more than they can establish a violation in the first place.[12] To the extent the DOJ seeks patient records to generate future investigative leads, the Subpoena is a quintessential "fishing expedition," an approach the Sixth Circuit has expressly rejected. *K-Mart Corp.*, 694 F.2d at 1066 (citation omitted); *cf. QueerDoc, PLLC*, 807 F. Supp. 3d at 1304 (holding a substantially similar subpoena to be in the nature of a "fishing expedition" because "it seeks to rifle through thousands of patient records hoping to find something— *anything*—to justify its predetermined goal of ending gender-affirming care." (citation omitted)).

### B. The Burden of Producing Patient Records Is Enormous

The Court must "weigh the likely relevance of the requested material to the investigation against the burden to [Cincinnati Children's] of producing the material." *EEOC. v. Ford Motor Credit Co.*, 26 F.3d 44, 47 (6th Cir. 1994). The Supreme Court has long admonished courts to be cognizant of the burdens associated with expansive administrative subpoenas. "Officious examination can be expensive" and "time consuming," can "clog[] the processes of business," and

---

[12] In fact, as the District of Rhode Island recently pointed out, Section 353(b)(2) of the FDCA specifically exempts any drug "dispensed pursuant to a licensed practitioner's prescription" from the labeling requirements of Section 352. *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-00007, at 17.

"can become persecution when carried beyond reason." *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 213 (1946). Here, the Patient Records Requests impose an immense burden on Cincinnati Children's that decisively outweighs the (non-existent) relevance of the records sought.

The Patient Records Requests cumulatively seek voluminous medical, biographical, and sociological information and records for every patient prescribed "puberty blockers or hormone therapy" during the relevant period, and all documents "relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy" and "informed consent, patient intake, and parent or guardian authorization for minor patients." Ex. 1, Attachment A at 6. The Patient Records Requests necessitate a close review of each of these records, including compiling each patient file from the Relevant Period, reviewing for and redacting or removing protected or sensitive information, and complying with the detailed production requirements imposed by the Subpoena. *See* Antommaria Decl. ¶¶ 24–25. This is exactly the type of "expensive" and "time consuming" process that subjects subpoena recipients to unreasonable burdens, *Oklahoma Press*, 327 U.S. at 213.

This burden is only increased by "[t]he gravity of the privacy concerns" at stake, which are so important that they are entitled to constitutional protections. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611, 617 (2021); *In re Admin. Subpoena 25-1431-032 to R.I. Hosp.*, No. 1:26-mc-00007, at 21-22 (discussing constitutional right to informational privacy). The records at issue here contain extraordinarily sensitive medical information, and courts have recognized that "medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection." *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980). Further, the Patient Records Requests seek medical information for *children* accused of doing nothing improper or illegal, requiring even greater protection. *See Doe*,

253 F.3d at 271 (noting that the court was "more reluctant" to enforce a subpoena against minors who are not targets of the investigation). And Ohioans have an even greater expectation of privacy in light of Ohio's protective patient privacy regime. *Thomas v. Nationwide Child.'s Hosp., Inc.*, 2018 WL 1512908, at *5 (S.D. Ohio, Mar. 27, 2018) (sealing medical records "in light of HIPAA and Ohio's even more stringent confidentiality laws," and "especially because the records referred to are medical records of and health care discussions about the treatment of infant children"); *see also Turk v. Oiler*, 732 F.Supp.2d 758, 770–71 (N.D. Ohio 2010). Moreover, by burdening patient privacy, the Subpoena imposes immense burdens on Cincinnati Children's associational rights by threatening its doctor-patient relationships, which rely on trust and confidentiality. *See First Choice Women's Resource Centers, Inc. v. Davenport*, 608 U.S. ---, 2026 WL 1153029 (U.S. Apr. 29, 2026) (recognizing that intrusive subpoenas may substantially chill freedom of association).

Any assurances the DOJ might make to maintain confidentiality of PHI would not dispel these concerns. "While assurances of confidentiality may reduce the burden of disclosure to the [government], they do not eliminate it." *Bonta*, 594 U.S. at 616. No such assurances have been provided here. If it responded to the Subpoena, Cincinnati Children's could only tell its patients that "their privacy might be protected—or it might not." *First Choice*, 2026 WL 1153029, at *9. The Patient Records Requests have no relevance to the DOJ's proffered basis for its investigation, and producing those records would impose enormous privacy, associational, administrative, and financial burdens on Cincinnati Children's and its patients. This balancing test yields only one result: the Court should exclude the Patient Records Requests.

## IV. Enforcement of the Subpoena Would Constitute an Abuse of the Court's Process

A subpoena cannot be enforced where doing so would abuse the court's process. *Doe*, 253 F.3d at 265. A court's process is abused where a subpoena is "issued for an improper purpose, such as to harass the [target] or to put pressure on him to settle a collateral dispute, or for any other

- 17 -

purpose reflecting on the good faith of the particular investigation." *Id.* at 271–72 (quoting *United States v. Powell*, 379 U.S. 48, 58 (1964)). This is a "heavy" burden, *Kondik v. United States*, 81 F.3d 655, 656 (6th Cir. 1996), requiring "specific facts and evidence to support" such allegations. *Cypress Funds, Inc. v. United States*, 2000 WL 1597833, at \*4 (6th Cir. Oct. 20, 2000) (quoting *Liberty Fin. Serv. v. United States*, 778 F.2d 1390, 1392 (9th Cir. 1985)). That burden is met here.

Subpoenas may be improper for multiple reasons. For example, the Sixth Circuit has recognized that it is improper for the DOJ to issue a civil investigative demand for the purpose of coercing the recipient to take actions desired by the government. *See Chattanooga Pharm. Ass'n v. U.S. Dep't of Just.*, 358 F.2d 864, 867 (6th Cir. 1966) (holding a DOJ civil investigative demand was improper when it was issued to pressure the recipient into dropping a pending lawsuit). Other courts have recognized as improper subpoenas that were issued as a result of personal vendettas and political pressure, as well as those used to gather evidence for use in separate investigations. *See, e.g.*, *United States v. Gertner*, 65 F.3d 963, 970 (1st Cir. 1995) (improper evidence gathering); *SEC v. Wheeling-Pittsburgh Steel Corp.*, 648 F.2d 118, 130 (3d Cir. 1981) (en banc) (result of political pressure); *EEOC v. First Ala. Bank of Birmingham*, 440 F. Supp. 1381, 1385 (N.D. Ala. 1977), *aff'd* 611 F.2d 132 (5th Cir. 1980) (pursuing personal vendetta and collateral disputes). The hallmarks of improper use of the subpoena power are undeniably present here, where the government has specifically stated its intent to wield its investigative capabilities in furtherance of its efforts to "end" gender-affirming care nationwide. *See* E.O. 14187 §§ 2, 8; Bondi Memo at 6.

The government's demands for confidential patient records appear designed to intimidate patients seeking gender-affirming care, to chill First Amendment protected communications between patients and providers, and to threaten the trust established between patients and hospitals. The DOJ has never identified any particularized suspicion of wrongdoing by Cincinnati

- 18 -

Children's. Nevertheless, it now demands production of extraordinarily sensitive patient documents irrelevant to its FDCA "misbranding" theory.

All other courts to have considered abuse of process challenges to substantially identical subpoenas have held that the subpoenas were issued for an improper purpose and in bad faith. *See, e.g.*, *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151, at \*11 ("Both the EO and the Bondi Memo strongly suggest that the purpose of investigating possible violations of the FDCA are to end gender-related treatment for minors."); *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 239 ("It is abundantly clear that the true purpose of issuing the subpoena is to . . . intimidate [the hospital] to stop providing such care, and to dissuade patients from seeking such care."); *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 583 ("Section 3486, does not authorize a federal investigation into lawful medical practice simply because the President or current Attorney General disapproves of the care provided"); *In re Children's Nat'l Hosp.*, 2026 WL 160792, at \*9 ("[T]he Subpoena appears to have no purpose other than to intimidate and harass."). This Court should reach the same conclusion.

The DOJ's attempt to broadly regulate healthcare also threatens Ohio's sovereign police power, including its "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *United States v. Skrmetti*, 605 U.S. 495, 523 (2025) (quoting *Gonzalez v. Carhart*, 550 U.S. 124, 163 (2007)); *see also Medtronic*, 518 U.S. at 475 (describing traditional state police powers "to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons" (citation omitted)). Ohio has already considered the issue of gender-affirming care and crafted a statutory framework that applies statewide, including by allowing continuing treatment of certain Ohio residents who were patients receiving care before the passage of the

relevant law. *See* R.C. 3129.01–3129.06. This Court should not disturb this statutory scheme, and should thus prohibit the DOJ from regulating this issue by arbitrary enforcement.

**V.     The Court Should Permit Discovery and Conduct an Evidentiary Hearing as Necessary**

The Court has broad discretion to regulate discovery. Where, as here, the record clearly establishes a "plausibl[e] inference of improper motive" by the government, discovery into the purpose of the Subpoena should be permitted. *United States v. Clarke*, 573 U.S. 248, 254 (2014).

**CONCLUSION**

Cincinnati Children's respectfully requests that this Court enter an order:

1.     Modifying the Subpoena to exclude Request Nos. 11, 12, and 13, and limiting all other Requests to the extent they call for production of the identities or PHI of patients or their families;

2.     Issuing a protective order relieving Cincinnati Children's from any obligation to produce material that contains the PHI of its patients or their families;

3.     In the alternative, permitting targeted discovery into the government's purpose in issuing the Subpoena and convening an evidentiary hearing regarding the issue of improper purpose and bad faith; and

4.     Such other relief as the Court deems just and proper.

Dated: May 18, 2026

Respectfully submitted,

/s/ Lindsay K. Gerdes
Lindsay K. Gerdes (0100896)
J. David Brittingham (0061577)
Joseph K. Merical (0098263)
**DINSMORE & SHOHL LLP**
255 E. 5th Street, Ste. 1900
Cincinnati, OH 45202
Telephone: (513) 977-8200
Facsimile: (513) 977-8147
Lindsay.Gerdes@dinsmore.com
David.Brittingham@dinsmore.com
Joseph.Merical@dinsmore.com

Neal K. Katyal (*pro hac vice* forthcoming)
Colleen E. Roh Sinzdak (*pro hac vice* forthcoming)
Chase J. Hanson (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
nkatyal@milbank.com
crohsinzdak@milbank.com
chanson@milbank.com

Nola B. Heller (*pro hac vice* forthcoming)
Scott B. Singer (*pro hac vice* forthcoming)
Haley Ling (*pro hac vice* forthcoming)
Madeline Van Ert (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
nheller@milbank.com
ssinger@milbank.com
hling@milbank.com
mvanert@milbank.com

- 21 -

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing was served upon the following this 18th

day of May 2026 via U.S. mail and electronic mail upon the following:

Patrick Runkle, Esq.
Ross Goldstein, Esq.
Scott B. Dahlquist, Esq.
Jordan C. Campbell, Esq.
Steven R. Scott, Esq.
David L. Gunn, Esq.
Brantley T. Mayers, Esq.
U.S. Department of Justice, Civil Division
950 Pennsylvania Avenue NW
Washington DC 20530-0001
patrick.r.runkle@usdoj.gov
ross.goldstein@usdoj.gov
scott.b.dahlquist@usdoj.gov
jordan.c.campbell@usdoj.gov
steven.r.scott@usdoj.gov
david.l.gunn@usdoj.gov
brantley.t.mayers@usdoj.gov

*Attorneys for United States of America*
*Department of Justice, Civil Division*

/s/ Lindsay K. Gerdes
Lindsay K. Gerdes (0100896)