**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| **In re: Administrative Subpoena No. 25-1431-033** | **Case No. 1:26-mc-00018** |

**UNITED STATES' RESPONSE IN OPPOSITION TO MOTION TO MODIFY THE SUBPOENA**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...............................................................................................................ii

INTRODUCTION .......................................................................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ..................................................................2

    I.     DOJ's Investigation. ......................................................................................................2

    II.    July 2025 Subpoenas. ...................................................................................................3

ARGUMENT................................................................................................................................5

    I.     Hospital Failed to Timely Challenge the Subpoena. ....................................................5

    II.    The Subpoena was Properly Issued Under HIPAA. .....................................................9

    III.   The Requested Documents are Relevant and the Burden on Hospital is Routine. .................11

        A.    Hospital's relevancy argument is incorrect as a matter of law. ...............................11

        B.    Hospital's burden argument is both incredulous and incorrect as a matter of law..............14

    IV.   Hospital Fails to Show an Improper Purpose. ...........................................................16

    V.    Hospital's Naked Allegations of Bad Faith Defeat its Discovery Request...............................19

CONCLUSION............................................................................................................................21

**INTRODUCTION**

The Department of Justice ("Department" or "DOJ") has long held statutory authority to investigate and prosecute violations of the nation's drug and healthcare laws. That authority is broad, well-established and regularly exercised. This case arises from one such investigation. Cincinnati Children's Hospital Medical Center ("Movant" or "Hospital")—a hospital that has received a subpoena as a part of a DOJ investigation—untimely comes to this Court seeking to modify the subpoena to prevent the DOJ from exercising its statutory authority to investigate potential violations of law.

Hospital's request to modify the subpoena fails at the statutory threshold. The deadline to challenge the subpoena—August 7, 2025—has long since passed and this Court cannot graft an exception to the statute that was not contemplated by Congress. And even taking Hospital's erroneous legal theory at its face would not save Hospital's motion because no "unusual circumstances and a good cause" exist to allow this belated challenge. Even if Hospital's motion were somehow timely, it is meritless. The Department is well within its investigative authority to issue such subpoenas, as Congress created the subpoena authority precisely to permit access to patient records in investigations of healthcare offenses, subject to the safeguards it deemed sufficient. Moreover, the DOJ routinely seeks and obtains patient records in healthcare offense investigations. There is nothing extraordinary or controversial about an administrative subpoena issued to a healthcare provider and Hospital has provided no plausible basis to effectively veto the Department's ability to investigate such offenses. Finally, Hospital's naked allegations and lack of concrete evidence are fatal to both its improper purpose and bad faith investigation claims. For all these reasons, Hospital's motion should be denied as untimely and substantively meritless.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.        DOJ's Investigation.

This case concerns an investigation into the off-label prescription and provision of certain drugs to minors with gender dysphoria. These include prescription drugs that suppress the production of sex hormones to delay puberty (commonly referred to as "puberty blockers") and cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite sex and less like the individual's biological sex. *See United States v. Skrmetti*, 605 U.S. 495, 503–04 (2025) (describing use of these drugs). Although these drugs are approved by the Food and Drug Administration ("FDA") for some uses, FDA has not determined that any of these drugs are safe or effective for the treatment of gender dysphoria, nor has FDA approved any of these prescription drugs for the treatment of gender dysphoria or any other psychiatric disorder.

One focus of the Department's investigation is potential violations of the Food, Drug, and Cosmetic Act ("FDCA"). The FDCA generally prohibits "misbranding" a drug. *See* 21 U.S.C. §§ 331(a)–(c), (k); 352. A drug may be misbranded if, among other things, its labeling is false or misleading, *id.* § 352(a), or if its labeling does not bear adequate directions for its intended use. *Id.* § 352(f)(1). "Intended use[]" means the "objective intent of the persons legally responsible for the labeling of an article (or their representatives)." 21 C.F.R. § 201.128. Such intent "may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives." *Id.* And the "intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer." *Id.* If, for example, a seller "intends an article for different uses than those intended by the person from whom he or she received the article," then the "seller is required to supply adequate labeling in accordance with the new intended uses." *Id.*

Under the FDCA, drug labeling is broadly defined to include any "written, printed, or graphic matter … accompanying" the drug. 21 U.S.C. § 321(m). The term "accompanying" includes materials that are separate from but related to the drug and any material that supplements, explains, or is designed for use with the drug. *See id.* § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345, 349–50 (1948); *United States v. Urbuteit*, 335 U.S. 355, 357 (1948); *United States v. 47 Bottles, More or Less, Etc.*, 320 F.2d 564, 569 (3d Cir. 1963). Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials.

Misdemeanor violations of the FDCA are punishable on a strict liability basis, without any proof of criminal intent. *See* 21 U.S.C. § 331, § 333(a)(1); *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964). For example, if a drug manufacturer or other person causes the distribution of an approved drug for an unapproved use, the manufacturer or other person could be charged with misbranding the drug or distributing a drug with labeling that lacks adequate directions for its intended uses. 21 U.S.C. §§ 331(a)–(c), (k), 352(f)(1). Where a violator has an intent to defraud or mislead, an FDCA violation may be punishable as a felony. *Id.* § 333(a)(2).

## II. July 2025 Subpoenas.

In the investigation of a "Federal health care offense[,]" HIPAA permits the Attorney General to issue a subpoena. 18 U.S.C. § 3486(a)(1)(A)(i)(I). A federal health care offense includes a "violation of, or a criminal conspiracy to violate" 21 U.S.C. § 331 "if the violation or conspiracy relates to a health care benefit program." 18 U.S.C. § 24(a)(2). And a "health care benefit program" is "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." *Id.* § 24(b).

Pursuant to this authority, as a part of its investigation into potential violations of the FDCA, the DOJ issued in July 2025 more than 20 subpoenas to doctors and clinics, including Hospital. *See*

3

18 U.S.C. § 3486(a). The Requests in those subpoenas, all of which extend from January 1, 2020, to the present, can be parceled out into four groups. Request 1 seeks personnel files to identify who had authority over prescribing, billing, or marketing practices. Requests 2 through 6 cover billing records, insurance claims, and diagnosis coding. Requests 7 through 10 seek records of Hospital's relationships with drug manufacturers. And as is often the case in investigations like this one, the final Requests 11–15 group requests patient records and related information ("PHI"):

> Request 11: "[d]ocuments sufficient to identify each patient (by name, date of birth, social security number, address, and parent/guardian information) who was prescribed puberty blockers or hormone therapy."

> Request 12: "[f]or each such patient identified in Subpoena [Request 11], documents relating to the clinical indications, diagnoses, or assessments that formed the basis for prescribing puberty blockers or hormone therapy."

> Request 13: "[a]ll documents relating to informed consent, patient intake, and parent or guardian authorization for minor patients identified in [Request 11], including any disclosures about off-label use (i.e., uses not approved by the United States Food and Drug Administration) and potential risks."

(Pl. Mot. to Modify, Dkt. 1 at PageID 2) ("Mot.").

On August 22, 2025, Hospital served their responses and objections to the Requests on the Department. What followed was a series of negotiations between the parties during which Hospital agreed to produce certain documents that did not contain PHI. In the meantime, while other documents were being produced, the Department offered Hospital the opportunity to redact and produce the documents containing PHI, with an understanding that should the Department request deanonymization, the Hospital would do so. Hospital has never objected to this arrangement, to this Court or to the Department despite having only two options: complying in full with the subpoena or challenging it in court. But, to date, Hospital remains non-compliant.

After almost a year of stringing the Department along with promises of compliance and piecemeal productions of certain documents while waiting for other subpoenaed hospitals to play out their challenges in other district courts, Hospital now moves to modify the subpoena to limit

4

production of the PHI in connection with Requests 11, 12 and 13, as well as limit any other requests to the extent those requests call for the production of PHI. *See generally* (Mot.).

The Court should deny all requests.

## ARGUMENT

Congress has authorized the Department to investigate and prosecute federal healthcare offenses. Accordingly, the Department "may take steps to inform itself as to whether there is probable violation of the law." *United States v. Morton Salt*, 338 U.S. 632, 643 (1950). Indeed, the Department "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not." *Id.* at 642–43. No showing of probable cause is necessary. *See United States v. Powell*, 379 U.S. 48, 57 (1964). And in its investigation, the Department is entitled to any evidence unless it is "plainly incompetent or irrelevant to any lawful purpose" of the Department in investigating federal healthcare offenses. *Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943). In accord with these principles, a court must enforce an administrative subpoena "if 1) it satisfies the terms of its authorizing statute, 2) the documents requested were relevant to the [Department's] investigation, 3) the information sought is not already in the [Department's] possession, and 4) enforcing the subpoena will not constitute an abuse of the court's process." *Doe v. United States*, 253 F.3d 256, 265 (6th Cir. 2001). In addition to Hospital's motion being untimely and barred by the principles of sovereign immunity, each of these requirements is easily satisfied here.

### I.      Hospital Failed to Timely Challenge the Subpoena.

To start, Hospital's motion fails at the threshold because it is untimely. The Supreme Court has made clear that a recipient's "ability to challenge a[n administrative] subpoena is cabined by strict procedural requirements." *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 (1984). And "if the concept of a filing deadline is to have any content, the deadline must be enforced." *United States v. Locke*, 471 U.S. 84, 101 (1985). Indeed, statutory deadlines for challenges to government subpoenas are

5

important, and the government can properly insist on compliance with them. *See, e.g.*, *Hernandez v. Dep't of Def.*, No. 24-mc-29, 2025 WL 262353, at *1 (E.D. Va. Jan. 21, 2025) ("[B]ecause Hernandez was personally served the subpoena, he had ten days to file a motion to quash the subpoena in this Court . . ." and because the movant filed the challenge "one month after the statutory deadline had passed," the action was "time-barred"). Congress imposed a hard deadline for motions to quash HIPAA subpoenas: the return date on the subpoena's face. 18 U.S.C. § 3486(a)(5). That deadline for this subpoena was August 7, 2025—almost ten months before Hospital filed its motion.

In an attempt to excuse its obvious tardiness, Hospital makes two errors. *First*, Hospital erroneously posits that the standard governing Rule 45 disputes equally applies to administrative subpoenas. *Second*, even if it was right on the law, Hospital errs in suggesting that "unusual circumstances" and "good cause" rescue its belated challenge. Hospital's reliance on Rule 45 is wrong on every level. (Mot. at 8–9) (citing *Am. Elec. Power Co. v. United States*, 191 F.R.D. 132, 136–37 (S.D. Ohio 1999) (citation omitted) (evaluating timeliness of a motion to quash under Rule 45); *Maysey v. Henkel Corp.*, 2018 WL 314859, at *2 (W.D. Ky. Jan. 5, 2018) (same); *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 1991 WL 172930, at *1 (N.D. Ohio June 21, 1991) (same)). These decisions—none of which involved administrative subpoenas—are wholly inapplicable to the case at hand. The Sixth Circuit has squarely held that Rule 45 "does not apply to the enforcement of subpoenas issued by administrative officers and commissions pursuant to statutory authority." *Equal Emp. Opportunity Comm'n v. Ferrellgas, L.P.*, 97 F.4th 338, 346 n.5 (6th Cir. 2024) (quotations omitted); *see also Goodyear Tire & Rubber Co. v. NLRB*, 122 F.2d 450, 451 (6th Cir. 1941). Because Hospital's reliance on Rule 45 is foreclosed by circuit precedent, this Court need not entertain the Hospital's excuses for its gamesmanship.

Hospital's fallback—that Rule 81 gives this Court *discretion* to import the Federal Rules of Civil Procedure into administrative subpoena enforcement—offers no lifeline either. *United States v. Tenn. Walking Horse Breeders' & Exhibitors' Ass'n*, 727 F. App'x 119, 124 (6th Cir. 2018) ("[A]lthough Rule 45

6

does not apply directly to administrative subpoenas, Rule 81 makes clear that district courts have discretion to apply the federal rules generally to proceedings to enforce administrative subpoenas."). Rule 81 allows the Court to generally apply the Federal Rules of Civil Procedure to administrative subpoenas only to the extent the original statute is silent. Fed. R. Civ. P. 81(a)(5) ("except as otherwise provided by statute"). But Section 3486 is anything but silent. The statute creates an explicit right to challenge the subpoena within a defined window. 18 U.S.C. § 3486(a)(5) ("At any time before the return date specified in the summons, the person or entity summoned may, in the United States district court for the district in which that person or entity does business or resides, petition for an order modifying or setting aside the summons[.]"). That window has closed, and there are no gaps in the statute for the Federal Rules of Civil Procedure to fill.

Nor can this Court create a gap for untimely actions like this one. Any judicially-created exception for "good cause" and "unusual circumstances" would run afoul of the Rules Enabling Act. Under the Rules Enabling Act, the Supreme Court's power to promulgate Federal Rules of Civil Procedure is limited by the provision that "[s]uch rules shall not abridge, enlarge, or modify any substantive right." 28 U.S.C. § 2072. Congress has created a statutory entitlement to seek judicial review of the subpoena within the prescribed timeline. Creating an exception to the codified rules for seeking judicial review would upset the bargain Congress struck and bestow upon Hospital greater power than it is afforded under the statute. Because Section 3486 is not silent as to the deadlines, and because creating caveats to the substantive right would violate the Rules Enabling Act, this Court has *no* discretion to generally apply the Federal Rules of Civil Procedure to this dispute. Hospital's motion to quash should therefore be denied as untimely.

Even setting all that aside, there are no "unusual circumstances" or a "good cause" to excuse Hospital's tardiness. The Department made its position clear from the beginning: Hospital could comply by providing anonymized records, with potential deanonymization if and when DOJ requested

7

it, or Hospital could challenge the subpoena before the deadline. Hospital never objected to that arrangement. There was nothing in its responses to the subpoena, or in its communications to the Department that affirmatively reserved a right to challenge the subpoena later down the road, or any evidence of the Department affirmatively telling Hospital that it would have such a right. Instead, for nearly a year, Hospital kept telling the Department it was working toward compliance. As it turns out, it was merely stringing the Department along through multiple rounds of negotiations while it waited to see how other subpoenaed hospitals fared in their own challenges[1]—resulting in the non-precedential decisions Hospital now cites in this very motion. Such conduct does not deserve to be rewarded with an exception, especially so when the courts in the Sixth Circuit define that exception as "(1) the subpoena is overbroad on its face and exceeds the bounds of fair discovery; (2) the subpoenaed witness is a non-party acting in good faith; and (3) counsel for the witness and counsel for the subpoenaing party were in contact concerning the witness' compliance prior to the time the witness challenge the legal basis for the subpoena." *Cf. Graham Packaging Co., L.P. v. Indorama Ventures AlphaPet Holdings, Inc.*, No. CV 3:24-MC-00008-RGJ, 2024 WL 4520952, at *3 (W.D. Ky. Oct. 17, 2024), *objections overruled*, No. 3:24-MC-8-RGJ-RSE, 2024 WL 4793739 (W.D. Ky. Nov. 14, 2024) (declining to apply "unusual circumstances" exception to a discovery dispute where the subpoena was neither patently overbroad nor exceeded the fair bounds of discovery). This Court, as described above, not only cannot grant the relief Hospital is seeking, but it also should not do so either. Hospital was simply stalling for time while promising the Department compliance—the opposite of "good cause."

---

[1] Hospital's own filings demonstrate the point. Its declaration now claims that compliance would impose "enormous administrative burdens," that there is "no automated way to redact sufficient information," and that production "would require substantial personnel time." (Dkt. 1-1; ¶¶ 23-25). Hospital had nearly a year to raise these concerns with the Department or, in the alternative, before this Court. Instead, Hospital chose to play coy, stalling the investigation while promising compliance. Paragraphs 20 and 22 of the declaration are particularly telling: if doctor-patient privilege, the most obvious of the potential issues to challenge the subpoena under, is truly paramount and no anonymization scheme could address the concerns, those issues belonged before this Court before August 7, 2025, not buried in a motion filed almost a year after the deadline in an attempt to excuse Hospital's tardiness. This Court must not reward such strategy.

Additionally, Hospital's challenge is barred by the principle of sovereign immunity. The motion-to-quash provision is an express sovereign immunity waiver for Hospital to bring a civil action against the government. *Gaetano v. United States*, 994 F.3d 501, 506 (6th Cir. 2021) ("An action to quash a summons issued by [a federal agency] is a suit against the United States requiring a waiver of its sovereign immunity."). The United States becomes immune to lawsuits the day after the subpoena's return date. *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983) ("when Congress attaches conditions to legislation waiving the sovereign immunity of the United States, those conditions must be strictly observed"); *Clay v. United States*, 199 F.3d 876, 879 (6th Cir. 1999) (upholding district court's dismissal of a motion to quash IRS' subpoenas for lack of jurisdiction because the motion was not timely filed). Meaning, the subpoena's return date is a condition precedent to the waiver of sovereign immunity. *Skul v. United States*, No. 5:07 CV 0601, 2007 WL 1144799, at *1 (N.D. Ohio Apr. 16, 2007); *accord Callahan v. Schultz*, 783 F.2d 1543, 1545 (11th Cir. 1986) (government's consent to sue requires strict compliance with twenty-day rule). Hospital did not avail itself of that sovereign immunity waiver in time, and this Court cannot expand Hospital's substantive rights beyond what it is entitled to under Section 3486. Because the sovereign immunity waiver window is now closed, this Court cannot entertain Hospital's motion.

For all the above stated reasons, Hospital's motion is untimely and barred by the sovereign immunity doctrine. But even if this motion were to proceed on the merits, Hospital fares no better.

## II. The Subpoena was Properly Issued Under HIPAA.

Hospital next argues that the FDCA does not authorize subpoenaing individual patient records. Bizarrely, Hospital devotes several pages of its brief arguing the merits of whether its doctors

9

could be held liable under the FDCA for their roles in prescribing the drugs at issue—a completely different question from the Department's authority to issue the subpoena in the first place.[2]

Hospital's contention seems to be that because its doctors cannot be held liable for violations under the FDCA, the Department lacks authority under HIPAA to subpoena individual patient records. It cites precisely zero legal authority in support. This is because the question of underlying liability of one potential target of an investigation has nothing to do with whether patient records "may be relevant" to the Department's nationwide federal healthcare investigation. *See United States v. Rakhit*, No. 1:18CR33, 2020 WL 5530056, at *21 (N.D. Ohio Sept. 15, 2020) (quoting HIPAA and explaining that its underlying terms require the Department to seek "information 'which may be relevant to' federal health care investigations").

Beyond that, Hospital relies on the unwarranted assumption that Hospital and its doctors are the sole targets of this investigation, rather than, for example, pharmaceutical companies. *See infra*, Part III.A. When separated from Hospital's misunderstanding or mischaracterization (and those of the out-of-circuit district courts to which Hospital cites) on this issue, it becomes apparent that the Department has satisfied the statutory prerequisites to issuing and enforcing the subpoena. *Doe*, 253 F.3d at 262. It does so by proceeding within the confines of HIPAA.

One of the key purposes of HIPAA is to "combat waste, fraud, and abuse in health insurance and health care delivery." HIPAA, Pub. L. 104-191, 110 Stat. 1936 (1996). The legislative history of the statute confirms that Section 3486 was enacted to "establish procedures for the Attorney General to make investigative demands" for "**health information about an individual**" in health care offense investigations. H.R. CONF. REP. NO. 104-736, at 261 (1996), *reprinted in* 1996 U.S.C.C.A.N. 1990,

---

[2] As the subpoena says on its cover sheet, it was "[i]ssued under authority of Section 248 of the Health Insurance Portability & Accountability Act of 1996, Public Law No. 104-191 (18 U.S.C. § 3486)," (Mot. Ex. 1), not the FDCA.

2074 (emphasis added). Congress thus anticipated and authorized the Department's access to the very sorts of patient and billing records that Hospital seeks to shield.

That is why, in the same statutory section, Congress added specific protections governing the use of that information once produced. Section 3486(e) provides that generally, "[h]ealth information about an individual that is disclosed under this section may not be used in, or disclosed to any person for use in, any administrative, civil, or criminal action or investigation directed against the individual who is the subject of the information." 18 U.S.C. § 3486(e)(1). By enacting these safeguards, Congress made clear that HIPAA subpoenas would inevitably reach patient-identifying records—yet it chose not to carve out an exception simply because the records might be highly personal. If subpoenas under Section 3486 could not reach records about mental health, sexual health, or other sensitive topics, then fraud and abuse schemes exploiting those very areas would be insulated from investigation— exactly the opposite of what Congress set out to prevent in enacting the statute. Congress did not overlook the sensitivity of these records. To quash the subpoena here on that basis would be to impermissibly override a legislative judgment, *see Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (explaining that courts are "vested with the authority to interpret the law" and possess "neither the expertise nor the prerogative to make policy judgments"), and effectively immunize certain corners of the healthcare system.

### III.  The Requested Documents are Relevant and the Burden on Hospital is Routine.

Hospital's relevance and burden objections rest on a fundamental misreading of the law.

### A.  Hospital's relevancy argument is incorrect as a matter of law.

Hospital's theory is that patient records can't be relevant because the FDCA regulates drug manufacturers, not healthcare providers. The argument fails at the threshold because it applies the wrong legal standard—and then compounds that error by misunderstanding that an investigation does not automatically make one a target for prosecution.

The relevance bar for administrative subpoenas is deliberately low. The Supreme Court has held that the inquiry must be "generously construed" and is "not especially constraining," as to afford "the [government] access to virtually any material that might cast light" on its investigation. *Equal Emp. Opportunity Comm'n v. Shell Oil Co.*, 466 U.S. 54, 68–69 (1984); *see also, Doe*, 253 F.3d at 266. Courts do not ask whether the agency *needs* a particular document or whether it could conduct the investigation just as well without it—that is explicitly not the standard. *Equal Emp. Opportunity Comm'n v. McLane Co.*, 857 F.3d 813, 816 (9th Cir. 2017). Moreover, the relevance inquiry is keyed to the *investigation*, not to the elements of the potential healthcare offense. *See United States v. Comley*, 890 F.2d 539, 542 (1st Cir. 1989) (Agency "must show that the information sought by the subpoena is relevant to the purpose of the investigation"); *NLRB v. North Bay Plumbing, Inc.*, 102 F.3d 1005, 1009 (9th Cir. 1996) ("[T]he focus is on relevancy to the investigation[.]" (quotation omitted)); *Equal Emp. Opportunity Comm'n v. Lockheed Martin Corp.*, 116 F.3d 110, 113 (4th Cir. 1997) ("We determine relevancy in terms of the investigation rather than in terms of evidentiary relevance.") (quotation omitted).

Courts defer to an agency's own appraisal of what is relevant "so long as it is not obviously wrong." *FTC v. Invention Submission Corp.*, 965 F.2d 1086, 1089 (D.C. Cir. 1992) (quotation omitted). In other words, administrative subpoenas can and do permissibly seek information that is not relevant to any element of the offense under investigation, so long as the information advances the investigation itself. *Contra* (Mot. at 14) ("Patient records reflect medical providers' observations and treatment decisions; they do not bear on whether drugs or medical devices carry necessary labeling and branding."); *id.* ("Further, the notion that patient records could prove fraudulent intent under the FDCA is plainly wrong."); *id.*, at 2 ("Cincinnati Children's does not dispute that the government may in certain instances subpoena patient records in healthcare investigations. But the DOJ has not articulated why PHI is […] necessary to its investigation"). Hospital's argument misses the point entirely.

Even so, each category of requests here is plainly relevant and flows directly from the Bondi and Shumate memoranda's prioritization of investigations that Congress authorized in 18 U.S.C. § 3486. The Bondi and Shumate memoranda directed the Civil Division to use its authority to investigate potential violations of the FDCA related to puberty blockers and cross-sex hormones. Hospital houses a "transgender health center" where it offers "health services for transgender and gender nonconforming youth" and prescribes the drugs at issue. There are four groups of Requests, all of which extend from January 1, 2020, to the present. Request 1 seeks personnel files to identify who had authority over prescribing, billing, or marketing practices and to determine which actors may have liability. (Mot. Ex. 1 at 5). Requests 2 through 6 cover billing records, insurance claims, and diagnosis coding—squarely relevant to false billing and the "intent to defraud or mislead" element under 21 U.S.C. § 333(a)(2); (Mot. Ex. 1 at 5–6). Requests 7 through 10 seek records of Hospital's relationships with drug manufacturers. *Id.* at 6. For example, the government may rely on evidence of communication between pharmaceutical sales representatives and prescribing physicians and recommendations to doctors of diagnostic codes to mask off-label prescriptions to ensure payment for unapproved uses.[3] Finally, Requests 11 through 15 seek patient records, which will allow the Department to assess the scope of the potential violations at issue, identify patterns of misbranding or false billing, and assess fraudulent intent. Patient records may also be necessary to identify patients'

---

[3] *See, e.g.*, Press Release, U.S. Dep't of Just., *Eli Lilly and Company to Pay U.S. $36 Million Relating to Off-Label Promotion* (Dec. 21, 2005), https://perma.cc/2Y64-FUK5 (announcing guilty plea of drug manufacturer involving illegal off-label promotion, highlighting evidence that the defendant "[e]ncourag[ed] sales representatives . . . to send unsolicited medical letters to promote the drug for an unapproved use to doctors"); Press Release, U.S. Dep't of Just., *Genzyme Corporation to Pay $32.5 Million to Resolve Criminal Liability Relating to Seprafilm* (Sep. 3, 2015), https://perma.cc/P7AT-MUVT (highlighting evidence that manufacturer encouraged off-label uses by distributing promotional materials citing a misleading scientific study); *United States v. Endo Pharms., Inc.*, No. 1:14-CR-66 (N.D.N.Y. Feb. 21, 2014), Dkt. 2 (deferred prosecution agreement regarding drug manufacturer's off-label promotion of drug, highlighting evidence that manufacturer distributed a misleading scientific study and promoted off-label uses at educational presentations for physicians); Press Release, U.S. Dep't of Just., *Wyeth Pharmaceutical Agrees to Pay $490.9 Million for Marketing the Prescription Drug Rapamune for Unapproved Uses* (July 30, 2013), https://shorturl.at/bWKxw (highlighting evidence that manufacturer paid bonuses to incentivize off-label sales).

13

adverse health outcomes, which are often significant in FDCA and other health care offenses.[4] Every request follows logically from the investigation the Department is authorized to conduct under 18 U.S.C. § 3486. It is also not a hypothetical: in this investigation, the Department has obtained medical records from other pediatric hospitals that have used pharmaceuticals for gender-related medical interventions, and review of those records has revealed evidence that treatments have been coded as treatment for disorders other than the actual diagnosis, suggesting concealment of off-label use of puberty blockers and hormones.

Hospital also makes the unwarranted assumption that it is the *target* of this investigation. The Department has made no such determination. Hospital may be a witness to, for example, pharmaceutical companies promoting puberty blockers for off-label use, to false statements made by third parties about gender-related pharmaceuticals for minors, or to conduct by its own personnel that Hospital's management knew nothing about. In sum, because Hospital's argument completely misses the mark, this Court should reject it.

### B. Hospital's burden argument is both incredulous and incorrect as a matter of law.

*First*, Hospital's burden objection is unpersuasive because the amount of documents Hospital needs to produce and review is a product of Hospital's own operations.[5] Indeed, the breadth of the requests flows from the nature of the investigation itself: because the Department's "inquiry" is "a relatively broad one," "the permissible scope of materials that [can] reasonably be sought [is] necessarily equally broad." *McPhaul v. United States*, 364 U.S. 372, 382 (1960); *see Securities & Exch.*

---

[4] *See, e.g.*, Press Release, U.S. Dep't of Just., *Founder and Chief Executive Officer of Injectable Stem Cell Product Manufacturer Sentenced for Distributing Unapproved Drug* (Sept. 30, 2024), https://perma.cc/JWH4-23UA (highlighting evidence that defendant's conduct was linked to patients' hospitalization); Press Release, U.S. Dep't of Just., *Owners and CEO of Wholesale Pharmaceutical Company Sentenced for Distributing More Than $92M of Black-Market HIV Drugs* (March 16, 2026), https://perma.cc/X2TR-8JBJ (highlighting trial testimony from patient who was harmed by defendants' conduct).

[5] Hospital also makes no contention that *the number* is burdensome, just a conclusory assertion that the burden is large because it would require careful review of patient records.

*Comm'n v. McGoff*, 647 F.2d 185, 192–93 (D.C. Cir. 1981) ("We agree that the demands are broad. But the nature of the inquiry precludes a trim list of requests." (footnote omitted)); *cf. Sugarloaf Funding, LLC v. U.S. Dep't of the Treasury*, 584 F.3d 340, 348 (1st Cir. 2009) ("[T]here are no cases that universally proscribe the use of 'all documents' language."). The Department's requests are not atypical in this area—administrative subpoenas regularly require substantial production. *See, e.g.*, *In re Subpoena Duces Tecum*, 228 F.3d 341, 350 (4th Cir. 2000) ("[I]f Bailey had treated 15,000 patients over a period of seven years and all of them were reimbursed on claims he submitted, a suspicion of fraud on these claims would justify a review of Bailey's documentation of services to these patients, of the claims submitted on their behalf, and of the reimbursements collected."); *see also In re Grand Jury Subpoenas Duces Tecum Dated January 30, 1986*, 638 F. Supp. 794, 795–96 (D. Me. 1986) (concluding that grand jury subpoenas in a health-care fraud investigation were not overbroad despite necessity that psychiatrist review all 2,500 patient files).

Hospital's claim that it cannot absorb the burden of producing patient records is not credible. This is a large, sophisticated healthcare institution with thousands of employees and modern records infrastructure. Patient data in 2026 is not stored in filing cabinets. The notion that complying with this subpoena would put upon Hospital a massive burden requiring armies of personnel wading through boxes of paper belongs to the past century.[6] A few database queries and mouse clicks is not an undue burden. Furthermore, Hospital makes no demonstration as to why the required production is particularly burdensome beyond its conclusory assertions and a self-serving affidavit.

*Second*, Hospital's burden on privacy argument opens with a Supreme Court decision[7] that did not involve a subpoena and a Third Circuit decision enforcing the government's subpoena and finding

---

[6] As shown above, however, even the courts from the past century rejected this argument.

[7] Indeed, *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 611 (2021) mentions privacy concerns, but only generally and in a way that's easily distinguishable. As already discussed, that case did not involve a subpoena.

that strong public interest in facilitating research and investigations of National Institute for Occupational Safety and Health justified minimal intrusion into privacy surrounding employees' medical records. (Mot. at 16). The lack of direct precedent on point is unsurprising, as Hospital's "burden on privacy" consideration when evaluating burden on the subpoenaed party is made up. *See Doe*, 253 F.3d at 279–280; *contra FDIC v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) ("When personal documents of individuals, as contrasted with business records of corporations, are the subject of an administrative subpoena, privacy concerns must be considered."). While the *Doe* court recognized the heightened privacy concerns when the government requests a patient's personal files in contrast to corporate records, it did not follow the Third Circuit. Instead, the Sixth Circuit endorsed and adopted applicability of the "reasonable relevancy" inquiry to both corporate records and personal files alike. *Doe*, 253 F.3d at 279–280. Meaning, as long as the documents are reasonably relevant to the investigation, the subpoena passes the legal muster. *Morton Salt Co.*, 338 U.S. at 652. And, as previously discussed, the Department clears that bar.

## IV.    Hospital Fails to Show an Improper Purpose.[8]

This Court should enforce the subpoena because Hospital offers nothing but conjectures and speculations as evidence of the Department's allegedly improper purpose. The Supreme Court has recognized that a district court can refuse to enforce an administrative subpoena if doing so would

---

Moreover, the privacy concern was discussed in the context of freedom of association— *Bonta* did not heighten the burden for the government to show relevancy in a subpoena enforcement proceeding.

[8] The Department acknowledges that a handful of mistaken district judges have found "improper purpose" given the administration's policy positions and priorities. *See, e.g.*, *In re Subpoena Duces Tecum No. 25-1431-016*, 2025 WL 3562151; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 239; *In re Subpoena No. 25-1431-014*, 810 F. Supp. 3d at 583; *In re Children's Nat'l Hosp.*, 2026 WL 160792. These decisions are wrong, and several are currently on appeal. Regardless, these decisions do not constitute "specific facts and evidence" Hospital is required to produce as part of its burden, even if it relies on these decisions to prove this element.

abuse the court's process—but the bar for showing that abuse is high, and Hospital falls short of clearing it. *Powell*, 379 U.S. at 58.

A subpoena crosses the line into that territory if it is issued, for example, to harass the recipient or pressure it to settle a collateral dispute. *Id.* And critically, the subpoena must have been issued *solely* for that improper purpose. *See, e.g., Donaldson v. United States*, 400 U.S. 517, 533 (1971) (inquiring whether "the sole objective of the investigation is to [impermissibly use a civil subpoena] to obtain evidence for use in a criminal prosecution"). A mixed purpose subpoena—one with both a legitimate and an allegedly improper purpose—gets enforced. *Lynn v. Biderman*, 536 F.2d 820, 826 (9th Cir. 1976) ("It is not . . . a ground to deny enforcement of a subpoena that it is being employed for a wrongful purpose if there is also a legitimate purpose for the subpoena."); cf. Restatement (Second) of Torts § 682 cmt. b (A.L.I. 1977), Westlaw (database updated Sep. 2025) (explaining that tort of abuse of process will not lie where there is both a legitimate motive and "an incidental motive of spite or an ulterior purpose of benefit to the defendant"). Accordingly, the Supreme Court has recognized that the subpoena recipient bears a "heavy" burden in proving the subpoena was issued pursuant to an improper purpose. *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978). That burden requires "specific facts and evidence"—not suspicions, not inference, not disagreement with government policy. *Cypress Funds, Inc. v. United States*, 2000 WL 1597833, at *4 (6th Cir. Oct. 20, 2000) (quotations omitted). Hospital tries to establish improper purpose through three arguments.[9] All fail.

---

[9] Hospital's fourth argument that the Department's investigative subpoena sent to a hospital somehow threatens Ohio's sovereign police powers does not warrant consideration. The only party who may have standing to bring this argument is the great State of Ohio, and this Court would have the power to entertain such an argument only after the Attorney General of Ohio sued to enjoin the Department from issuing these subpoenas. Hospital has not been deputized to bring such a claim on behalf of Ohio and has *no* horse in that race. This Court is vested with power to adjudicate real controversies between real parties—it cannot entertain hypothetical constitutional questions raised by the wrong plaintiff on behalf of an absent sovereign. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102, 118 (1998). Regardless, even though regulation of health and safety is primarily, and historically, a matter of local concern, there is no question that the federal government can set uniform national standards in these areas. *Gonzales v. Oregon*, 546 U.S. 243, 271 (2006) (citations omitted). If a manufacturer, distributor, or Hospital committed a federal healthcare offense in the provision of puberty

17

From the outset, Hospital's argument fails because even if it had shown improper purpose, the existence of a proper investigative purpose in tandem with an improper one makes the subpoena enforceable. *Lynn v. Biderman, supra.* As the Department explained in other similar proceedings, the FDA has never approved cross-sex hormone therapy as safe and effective treatment of gender dysphoria. *See, e.g.*, Ex. 1 at ¶¶7, 18.[10] And while it is not a crime for doctors to prescribe an approved drug for unapproved use, prescriptions for unapproved use *may involve violations* of the FDCA. *Id.* at ¶8. For this reason, the Department has opened an investigation. *Id.* at ¶¶26-31.

Hospital's first argument asserts that this subpoena, and the entire investigation, is designed to "end" gender-affirming care. (Mot. at 18). That is a policy characterization masquerading as a legal argument. An administration's policy statements on a particular topic have never amounted to an improper reason to issue a subpoena or further an investigation into whether a particular federal law has been violated. *Cf. Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities."); *Trump v. Hawaii*, 585 U.S. 667, 706–07 (2018). If policy opposition were enough to block an investigation, entire industries could insulate themselves from federal enforcement simply by making their services politically contentions. This cannot be the law, and it is not.

Hospital's second argument accuses the Department of seeking to "intimidate patients seeking gender affirming care," "chill the First Amendment," and "threaten the trust established between patients and hospitals." (Mot. at 18). The Sixth Circuit squarely rejected improper purpose arguments built on exactly this kind of foundation—where the claimed evidence of impropriety is a naked

---

blockers or cross-sex hormones, Ohio law would provide no defense. *See Doe v. Dynamic Physical Therapy, LLC*, 607 U.S. 11, 11 (2025) (per curiam) ("[A] State has no power to confer immunity from federal causes of action." (emphasis omitted)).

[10] The Department does not purport to use Exhibit 1 as a declaration, merely as an exhibit.

allegation without any support whatsoever. *See, e.g.*, *United States v. Markwood*, 48 F.3d 969, 983–84 (6th Cir. 1995) (rejecting improper purpose argument and concluding that the movant's claimed evidence was "merely an assertion of impropriety, that [did not] amount to a substantial demonstration that the government [wa]s abusing the court's process"). Hospital offers nothing more than did the *Markwood* movant and should fare no better.

Hospital's third argument posits that the Department never identified "particularized suspicion of wrongdoing" by Hospital specifically. (Mot. at 18). Again, that is beside the point. The Department may subpoena any entity with relevant information; it need not show the subpoena recipient is likely liable. And it is black-letter law that the government does not need probable cause or reasonable suspicion to issue or enforce an administrative subpoena. *See, e.g., Powell*, 379 U.S. at 57; *Morton Salt*, 338 U.S. at 642. The Department is equally under no obligation to disclose its investigative strategy, explain the particulars of its inquiry, or justify to Hospital why it is the subject of scrutiny. The "particularized suspicion" standard Hospital invokes has no basis in statute, rule, or precedent, and would represent a significant change in this area of law.

Because Hospital does not present "specific facts and evidence" to support its argument, resting its case on conjectures and decisions of other courts instead, it fails to carry the heavy burden.

## V.   Hospital's Naked Allegations of Bad Faith Defeat its Discovery Request.

The time to challenge Department's motives, as previously explained, was before August 7, 2025, not almost a year later. Even so, Hospital's belated request to put the Department's good faith on trial should also be denied because there is *no* plausible inference of any improper motive. Indeed, Hospital fails to meet the very standard it is invoking.

In *United States v. Clarke*, the Supreme Court made clear that a recipient of investigative subpoena can examine an agency's representative for bad faith only if he can point to *specific facts* raising an inference of improper purpose. 573 U.S. 248 (2014). Most importantly, the *Clarke* court itself

overturned the lower court's decision to allow a defendant to examine an IRS agent based on naked allegations alone—exactly what Hospital is doing here. *Id.* at 255. Hospital has offered no facts. Hospital offers exclusively naked allegations—accusing the Department of "intimidat[ing] patients seeking gender affirming care," "chill[ing] the First Amendment," and "threaten[ing] the trust established between patients and hospitals." (Mot. at 18). No evidence. No specific facts. No basis for any inference beyond Hospital's *ipse dixit.* This is the epitome of a naked allegation, and *Clarke* forecloses inquiry into the Department's motives. In contrast to these naked allegations, the Department has previously explained in other similar proceedings the reasons behind this investigation. *See, e.g.*, Ex. 1 at ¶¶7, 8, 18, 26–31.

Hospital is also asking this Court to do something it has no business doing, namely, deciding whether this investigation is good policy. "The Executive Branch—not the Judiciary—makes arrests and prosecutes offenses on behalf of the United States." *United States v. Texas*, 599 U.S. 670, 678–79 (2023). Indeed, under Article II, the Executive Branch possesses the "exclusive authority and absolute discretion," *Trump v. United States*, 603 U.S. 593, 620 (2024) (quotation omitted), to decide "how to prioritize and how aggressively to pursue legal actions against defendants who violate the law," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429 (2021). "The power to decide when to investigate, and when to prosecute, lies at the core of the Executive's duty to see to the faithful execution of the laws," *Community for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986), and "the Government's enforcement priorities" are a legitimate consideration in decisions about whether to prosecute. *Wayte v. United States*, 470 U.S. 598, 607 (1985). Hospital's disagreement with the Department's policies and investigation priorities is not evidence of bad faith. It is a policy dispute, and it has no place in this proceeding. Hospital has not met its burden, and the belated discovery request should be denied.

## CONCLUSION

For all of the above stated reasons, the Department respectfully requests this Court deny Hospital's motion.

Dated: this 8th day of June 2026.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

JORDAN C. CAMPBELL
Deputy Assistant Attorney General

LISA K. HSIAO
Acting Director
Enforcement & Affirmative Litigation Branch


 /s/ Eugene O'Halloran
ROSS S. GOLDSTEIN
PATRICK R. RUNKLE
Assistant Directors

EUGENE O'HALLORAN
LUKE A. MILLER
BRANTLEY T. MAYERS
Trial Attorneys

United States Department of Justice
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, DC 20044
Tel: (202) 598-7976
Eugene.O'Halloran2@usdoj.gov

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was served on this 8th day of June 2026

via the Court's ECF system upon the following:

Jon David Brittingham
Lindsay Kristine Gerdes
Chase J. Hanson
Nola B. Heller
Neal Kumar Katyal
Haley H.W. Ling
Joseph Kendall Merical
Scott B. Singer
Colleen E. Roh Sinzdak
Madeline T. Van E

*/s/ Eugene O'Halloran*

# EXHIBIT  1

The Honorable Jamal N. Whitehead

_____ FILED _____ ENTERED
_____ LODGED _____ RECEIVED

SEP 2 6 2025   LS

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                         DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

QUEERDOC, PLLC,

          *Movant,*

          v.

U.S. DEPARTMENT OF JUSTICE,

          *Respondent.*

Case No.: 2:25-MC-00042-JNW

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS

I, Allan Gordus, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

### GENERAL BACKGROUND

1. I am an attorney at the Consumer Protection Branch ("CPB")[1] of the United States Department of Justice ("DOJ") and have been so employed since 2000. Since joining CPB, I have investigated and prosecuted federal health care-related offenses, including violations of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA"), health care fraud, mail fraud, wire fraud, money laundering and conspiracy. *See, e.g., United States v. W. Scott*

---

[1] The Consumer Protection Branch was formerly known as the "Office of Consumer Litigation."

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 1
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218

*Harkonen*, Case No. 08-CR-0164-MHP (N.D. Cal. 2008); *United States v. Karen Ann Turner*, Case No. 17-CR-0109 (W.D.N.C. 2017); *United States v. Avanos Medical, Inc.*, Case No. 21-CR-0307-E (N.D. Tex. 2021) attached as Exhibit 1. As part of my work at CPB, I have participated in all phases of criminal investigations and prosecutions of violations of federal law.

2.     I make this Declaration in opposition to QueerDoc's Motion to Quash a federal administrative subpoena issued pursuant to 18 U.S.C. § 3486 by the United States Attorney General's delegate in the furtherance of an investigation of federal health care offenses (as defined by 18 U.S.C. § 24), as specified on the subpoena, in which other DOJ personnel are currently engaged.

3.     The facts in this Declaration come from my personal observations, my training and experience, and information obtained from other government personnel. This Declaration is intended to demonstrate that the administrative subpoena was issued in the furtherance of a nationwide federal investigation into potential systemic violations of federal law and that the records and other things the subpoena seeks are relevant to that investigation. This Declaration does not set forth all my knowledge about this matter.

## LEGAL BACKGROUND

### FDCA VIOLATIONS CAN BE FEDERAL HEALTH CARE OFFENSES

4.     The overriding purpose of the FDCA is to protect the public health. *United States v. Article of Drug … Bacto-Unidisk*, 394 U.S. 784, 798 (1969). The FDCA's purpose should "infuse construction of the [FDCA]" so that courts give the FDCA a liberal construction that furthers protection of the public health including in criminal enforcement of the FDCA. *Id. United States v. Dotterweich*, 320 U.S. 277, 280 (1943); *See also United States v. Park*, 421 U.S. 658, 672–73 (1975). This consideration applies even more strongly where the government seeks to enforce the FDCA to protect the health of children.

5.     A "Federal health care offense" for purposes of a subpoena issued under 18 U.S.C. § 3486 is defined by 18 U.S.C. § 24(a) as "a violation of, or a criminal conspiracy to

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 2
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218

violate … section 301 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 331) … if the violation or conspiracy relates to a health care benefit program." 18 U.S.C. § 24(a)(2). The statute defines "health care benefit program" to mean "any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract." 18 U.S.C. § 24(b). A subpoena issued under section 3486 (commonly referred to as a "HIPAA subpoena") may be used to investigate both violations of the FDCA as well as conspiracies to violate to the FDCA, if the violation or conspiracy relates to products or services that might ultimately be paid for by either a private or public health insurance program.

## FDA'S APPROVAL OF DRUGS

6. The FDCA regulates the development, manufacturing and distribution of drugs in the United States. For a "new drug" to enter interstate commerce, the manufacturer must first demonstrate to the United States Food and Drug Administration ("FDA") that the drug is both safe and effective for each of its intended uses. 21 U.S.C. §§ 331(d), 355(a). The introduction into interstate commerce of an unapproved new drug violates the FDCA. 21 U.S.C. § 331(d).

7. A drug manufacturer obtains FDA approval for a new drug through a new drug application ("NDA") that demonstrates that its drug is safe and effective for each of its intended uses. 21 U.S.C. § 355(a). As part of the approval process, FDA reviews the proposed labeling for the drug in the NDA which must include adequate directions for how to use the drug for each of its intended uses. 21 U.S.C. § 352(f); 21 C.F.R. § 201.5. When FDA approves a drug, FDA approves it as safe and effective for the particular use or uses in the NDA. Similarly, as part of its approval, FDA approves the labeling in the NDA as having adequate directions for the particular use or uses in the NDA. FDA's approval of a drug does not mean that the drug is safe and effective for unapproved uses or that the drug has adequate directions for unapproved uses.

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 3
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218

8.     While it is possible for doctors to prescribe an approved drug for an unapproved use, prescriptions for unapproved uses may involve violations of the FDCA.

**MISBRANDING OF DRUGS PRESCRIBED FOR UNAPPROVED USES THROUGH ILLEGAL LABELING**

9.     A drug is misbranded if its labeling does not have adequate directions for the use of the drug. 21 U.S.C. § 352(f). FDA-approved labeling contains directions only for the drug's approved uses. If a drug manufacturer or other person distributes an approved drug for an unapproved use, the manufacturer or other person could possibly be charged with misbranding the drug or distributing a misbranded drug for the distribution of the drug with labeling that does not have adequate directions for its intended uses.[2] 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(f)(1). CPB has participated in successful prosecutions of drug manufacturers for such illegal conduct. *See, e.g.*, *United States v. Pharmacia & Upjohn Co.*, Case No. 09-CR-10258-DPW (D. Mass. 2009); *United States v. Eli Lilly & Co.*, Case No. 09-CR-00020-RK (E.D. Pa. 2009) attached as Exhibit 2.

10.    A drug can also be misbranded if its labeling is false or misleading in any particular. 21 U.S.C. § 352(a).

11.    Under the FDCA, drug labeling is broadly defined as any "written, printed, or graphic matter ... *accompanying*" the drug. 21 U.S.C. § 321(m) (emphasis added). The term "accompanying" is interpreted broadly and includes materials that are separated from the drug but nonetheless related to it and includes any material that supplements, explains, or is designed for use with the drug. *See* 21 U.S.C. § 321(m); 21 C.F.R. § 1.3(a); *Kordel v. United States*, 335 U.S. 345 (1948); *United States v. Urbuteit*, 335 U.S. 355 (1948); *United States v. 47 Bottles ... Jenasol RJ Formula 60*, 320 F.2d 564, 569 (3d Cir. 1963) (literature was labeling where it was shipped by company to sales agent and then stored in the agent's bedroom closet: "[I]t cannot be said that ...the Court promulgated or intended to promulgate a requirement that there be an

---

[2] As noted above, it is possible for doctors to prescribe an approved drug for an unapproved use without violating the FDCA.

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 4
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218

actual use in order that the literature constitute labeling."). Labeling can include promotional materials, advertisements, brochures, flyers, instruction sheets, posters, and similar materials.

12. If a drug manufacturer or other person distributes (or causes the distribution of) an approved drug with false or misleading labeling for an unapproved use, the manufacturer or other person could possibly be charged with misbranding the drug or distributing a misbranded drug. 21 U.S.C. §§ 331(a), 331(b), 331(c), 331(k), and 352(a). CPB has participated in successful prosecutions of manufacturers for false and misleading labeling. *See, e.g., United States v. Avanos Medical, Inc.*, Case No. 21-CR-0307-E (N.D. Tex. 2021) (deferred prosecution agreement for false and misleading labeling for medical device) attached as Exhibit 1.

### ILLEGAL DISTRIBUTION OF AN UNAPPROVED NEW DRUG

13. A "new drug" is any drug that is "not generally recognized, among [qualified] experts . . . as safe and effective for use under the conditions prescribed, recommended, or suggested in the *labeling* thereof . . . ." 21 U.S.C. § 321(p)(1) (emphasis added).

14. If a drug manufacturer or other person distributes (or causes the distribution of) an approved drug for an unapproved use with labeling for that unapproved use, the manufacturer or other person could possibly be charged with distributing an unapproved new drug in violation of the FDCA. 21 U.S.C. § 331(d).

### INTENT FOR FDCA CRIMES

15. A violation of 21 U.S.C. § 331 is a federal criminal offense that can be punished as a strict liability misdemeanor without any proof of criminal intent. *See Park*, 421 U.S. at 672–73; *United States v. Wiesenfeld Warehouse Co.*, 376 U.S. 86, 91 (1964). Through its strict liability misdemeanor provision, the FDCA imposes rigorous criminal accountability on companies and individuals involved with drugs that affect the health of consumers in circumstances where consumers realistically cannot protect themselves. *See Weisenfeld*, 376 U.S. at 91; *Dotterweich*, 320 U.S. at 280–81. This rigorous accountability applies even more strongly when the consumers

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 5
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218

are children. Consequently, any violation of section 331, including the causing of any prohibited act listed in section 331, is a federal crime even in the absence of any criminal intent.

16. A felony FDCA violation is the same as a misdemeanor FDCA violation with the addition of an intent to defraud or mislead. 21 U.S.C. § 333(a). Evidence of an intent to defraud or mislead a government agency or some other third-party, such as a patient or an insurance company, in connection with an FDCA violation can be enough to prove a felony FDCA violation. Evidence of an intent to defraud or mislead can include taking steps to avoid detection of the illegal conduct.

### THE DRUGS AT ISSUE IN THIS INVESTIGATION

17. This investigation is focusing on prescription drugs increasingly used in gender-related care for children and adolescents suffering from a recognized mental disorder known as gender identity disorder or, as the most recent version of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS refers to it, gender dysphoria. DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 511–12 (5th ed. Text Revision 2025). Included in this group of prescription drugs are: (1) drugs used to suppress the production of sex hormones to delay puberty—the most common being gonadotropin-releasing hormone agonists ("GnRH agonists"), commonly referred to as "puberty blockers;" and (2) cross-sex hormones meant to induce physical changes to alter the child's secondary sexual characteristics to resemble those typically seen in the opposite sex and less like the individual's biological sex. Testosterone, a Schedule III controlled substance under the Controlled Substances Act, is included in this latter group.

18. FDA has not determined any of these drugs to be either safe or effective for the treatment of gender dysphoria. FDA has not approved any of these prescription drugs for the treatment of gender dysphoria or any other psychiatric disorder. While these drugs are FDA-approved for other indications (e.g., precocious puberty, prostate cancer, hypogonadism, etc.), there has been no NDA approved by FDA that establishes the safety and efficacy of these drugs for use in minors with gender dysphoria. As explained above, introducing such a "new drug" into

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 6
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218

interstate commerce for an unapproved use is potentially unlawful. To the extent these drugs are marketed or promoted for treating gender dysphoria in minors, they could constitute unapproved new drugs under federal law, and their distribution for that unapproved use could violate the FDCA and be a federal crime.

19. The child consumers of these powerful drugs may be significantly victimized by the bypassing of the drug approval process. The United States Department of Health and Human Services ("HHS"), of which FDA is a component agency, has determined that the evidence for the safety and efficacy of these drugs for the treatment of gender dysphoria in minors is weak. *See* U.S. DEP'T OF HEALTH & HUMAN SVCS., TREATMENT FOR PEDIATRIC GENDER DYSPHORIA, REVIEW OF EVIDENCE AND BEST PRACTICES (May 2025) (available at https://opa.hhs.gov/gender-dysphoria-report). Specifically, the United States government has found that some of the drugs under investigation here "carry risk of significant harms including infertility/sterility, sexual dysfunction, impaired bone density accrual, adverse cognitive impacts, cardiovascular disease and metabolic disorders, psychiatric disorders . . . and regret." *Id.* at 10. This is compounded by the fact that HHS has also determined that "the overall quality of [scientific] evidence concerning the effects of any intervention on psychological outcomes, quality of life, regret, or long-term health, is **very low**." *Id.* at 13 (emphasis added). This is consistent with the other international systematic reviews of the evidence on the use of the drugs to treat minors with gender dysphoria, which have led to the restriction of such hormonal interventions in countries across the world, including the United Kingdom, Sweden, Norway, Denmark, Brazil and Chile. *Id.* at 60-61.

20. Some of these drugs, including puberty blockers, are not administered orally. Rather, they are typically administered by injection by a medical professional or through an outpatient surgical procedure to implant the drug. Puberty blockers are typically implants or injectables that require a physician or nurse for administration in a clinic that must purchase, store, and administer the drug, placing them in the chain of distribution of the drug.

### RELEVANT FACTS ABOUT THE SUBPOENAED PETITIONER, QUEERDOC

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 7
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218

21. From information provided by whistleblowers and experts, there may be potential violations of federal law in gender-related treatments for minors including allegations of: the intentional use of incorrect diagnosis codes to fraudulently secure insurance coverage for gender-related treatments; misleading and deceiving child patients and their parents about the risks of gender-related treatments. Based on QueerDoc's website, it appears that QueerDoc may be engaging in such violations of federal law.

22. The investigative team identified the Movant, QueerDoc, as a telemedicine clinic that explicitly holds itself out in marketing and promotional materials (including through a website) as specializing in the treatment of children and adolescents who suffer from gender dysphoria, including by providing puberty blockers and cross-sex hormones to minors for these unapproved uses. QueerDoc prominently advertises these services under "Youth Gender Care," "QueerDoc Does Adolescent Care!," and related webpages. *See, e.g., Youth Gender Care*, https://queerdoc.com/adolescent-gender-care/ ("QueerDoc provides gender affirming care including puberty blockers and hormone therapy to adolescent patients."); https://queerdoc.com/queerdoc-does-adolescent-care/ ("There is no lower age limit for our patients, and QueerDoc prescribes blockers and hormones when appropriate.").

23. Much of QueerDoc's website may legally qualify as drug labeling under the FDCA, including a page entitled "Puberty Blockers FAQ" that gives written explanations of how the drugs work, what the risks and benefits are, and how they are used—that is, information that supplements and explains the drug. *See Puberty Blockers FAQ*, https://queerdoc.com/puberty-blockers-faq/. The information on these websites is potentially false and misleading labeling that renders the drugs misbranded. For example, QueerDoc's Youth Gender Care webpage states that "Puberty blockers are an option to put a 'pause button' on puberty and are completely reversible." This assertion that all effects of puberty blockers are fully reversible is potentially misleading. HHS and other clinical sources have stated that some effects are uncertain or

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 8
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218

possibly permanent. Similar statements about the reversibility of hormone drug effects on QueerDoc's website are likewise potentially false or misleading.

24. There is evidence that QueerDoc may have an intent to defraud and mislead related to potential violations of the FDCA. QueerDoc's website explicitly states that—as a matter of practice—it uses false diagnosis codes when prescribing for the unapproved use of treating gender dysphoria in order to disguise or hide the true purpose of the prescription to treat gender dysphoria, stating: "We usually order prescriptions under the diagnosis of 'endocrine disorder' not 'gender dysphoria,' but some [insurance] plans may require paperwork which requires us to disclose gender related treatments. Some plans automatically reject payment for 'gender-incongruent' treatments." *See Pharmacy Options*, https://queerdoc.com/pharmacy-options/. In addition to potentially providing the intent to defraud or mislead required for an FDCA felony, this practice may also violate other federal criminal statutes such as 18 U.S.C. § 1035 (false statements relating to health care matters) and 18 U.S.C. § 1347 (health care fraud). QueerDoc's website indicates that it may be prescribing drugs described herein to children for unapproved uses without proper assessment, disclosures and informed consent, and with minor patients potentially receiving prescriptions after a single telehealth visit.

25. A report by NBC News in August 2024, states that QueerDoc's principal, Dr. Crystal Beal, said that she "consider[s] [the QueerDoc] practice a form of civil disobedience" and that she "feel[s] compelled to defy anti-trans laws" by providing care even in states that have enacted laws making the provision of such care unlawful. Emma Davis, *Death Threats, Legal Risk and Backlogs Weigh on Clinicians Treating Trans Minors*, NBC News (Aug. 28, 2024), https://www.nbcnews.com/nbc-out/out-news/trans-minors-treatment-clinicians-laws-bans-rcna164515.

**THE SUBPOENA SPECIFICATIONS SEEK INFORMATION RELEVANT TO THE INVESTIGATION**

26. The fifteen requests in the investigative HIPAA subpoena the Attorney General (through her delegate, the Assistant Attorney General for the Civil Division) issued to QueerDoc

| | |
|---|---|
| DECLARATION OF GOVERNMENT ATTORNEY ALLAN GORDUS – p. 9<br>2:25-MC-00042-JNW<br>**FILED UNDER SEAL** | United States Department of Justice<br>Consumer Protection Branch<br>P.O. Box 386<br>Washington, DC 20044<br>(202) 353-4218 |

seek to further the investigation described above. The requests can be broadly broken down into four main categories: (1) requests related to personnel and corporate oversight (Request 1); (2) requests related to billing, coding, and reimbursement practices (Requests 2–6); (3) requests related to the practice's relationships with drug manufacturers, distributors, and pharmacies (Requests 7–10); and (4) requests regarding clinical practices and drug safety (Requests 11–15). All of the subpoenaed records and documents are relevant to the federal health care investigation described herein. *See* 18 U.S.C. § 3486(a)(1).

27. Request 1 seeks information to identify who had authority to direct prescribing, billing, or marketing practices to determine liability. Under strict liability doctrines, including the responsible corporate officer doctrine, officers and responsible personnel can be held criminally liable for FDCA violations even without direct participation. Personnel files also show financial incentives, disciplinary history, and/or training which can establish knowledge and intent.

28. The requests in the second group (regarding billing, coding, and reimbursement practices) are necessary to determine whether the clinic disguised treatment for gender-related mental disorders as another, physical illness (*e.g.,* endocrine disorder) to disguise or hide potential FDCA violations and potentially secure health care benefit program reimbursements through fraud. Such practices are especially important to demonstrate an "intent to defraud or mislead" under 21 U.S.C. § 333(a)(2) if the clinic misrepresented the intended use of the drugs. Moreover, training materials and internal discussions can reveal whether improper coding was a deliberate strategy.

29. The third group of requests (relating to relationships with drug manufacturers, distributors, and pharmacies) seeks evidence of an intent to market or promote drugs for unapproved uses in violation of the FDCA. If QueerDoc, or one of its affiliated health care providers, received promotional materials, "scientific exchange information," or payments to encourage prescribing of puberty blockers or cross-sex hormones, such information could support a FDCA theory (including conspiracy) involving the illegal misbranding of drugs or the

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 10
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218

illegal distribution of misbranded drugs or unapproved new drugs. Similarly, information regarding financial arrangements (consulting agreements, sponsorships, speaking honoraria) may suggest improper influence to reinforce a showing of an intent to misbrand the drugs, including with an intent to defraud or mislead.

30.    The final group of requests (relating to patient-level clinical practices and drug safety) will permit the United States to evaluate the scope of possible prescribing for unapproved uses (including the number and age range of patients treated), and consistency of diagnoses. It also establishes the scope of interstate distribution and the scale of potential FDCA violations. Linking each patient's clinical record to corresponding billing and insurance claims can demonstrate whether diagnoses were miscoded, which can prove fraudulent intent. Documentation of clinical justification, informed consent, and disclosure of unapproved use is key to assessing whether the clinic (and/or potential co-conspirators) concealed or downplayed risks associated with the unapproved use of the drugs. Absence or minimization of such warnings could establish an intent to mislead. Patient charts also typically capture adverse outcomes, side effects, and complications of drug use. By reviewing multiple patient records, the review may reveal systemic use of the same masking codes, fraudulent informed consent documents, or other possible criminal conduct. This enables investigators to distinguish between mere errors and an institutionalized practice. Finally, providing patient records including patient identities can provide essential investigative leads. Parents may be witnesses about what disclosures were made. Patients (depending on age and circumstances) may provide information about the informed consent process, side effects, or potentially false or misleading information about the drugs conveyed during treatment. Health benefit programs tied to identified patients could provide additional evidence on potentially illegal distribution of the drugs for unapproved uses. In sum, without this information, the government cannot fully determine the scope of any potential violations, identify patterns of misbranding or fraudulent billing, or assess whether the

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 11
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218

conduct was undertaken with intent to defraud or mislead, as required for a felony FDCA violation under 21 U.S.C. § 333(a)(2).

## GOVERNMENT INVESTIGATIVE RESOURCES

31.     This is a substantial national investigation of potential FDCA violations related to the unapproved use of drugs in gender-related care as reflected in the substantial government resources assigned to it. This matter is being handled by several veteran, career prosecutors with many decades of experience in health care fraud and FDCA enforcement, supported by a team of document analysts and other forensic specialists. Multiple FBI agents and analysts are assigned to assist with various field activities and are employing advanced data analytics to identify prescribing and reimbursement patterns and potential FDCA violations related to the unapproved use of the drugs. The scope and coordination of these efforts reflect the seriousness with which the government is pursuing potential violations of federal law.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 26th day of September, 2025.



_____
ALLAN GORDUS
Assistant Director
Consumer Protection Branch
United States Department of Justice

DECLARATION OF GOVERNMENT
ATTORNEY ALLAN GORDUS – p. 12
2:25-MC-00042-JNW
**FILED UNDER SEAL**

United States Department of Justice
Consumer Protection Branch
P.O. Box 386
Washington, DC 20044
(202) 353-4218